Ernest **NANCE**, Plaintiff,

v.

**LIBRARIAN OF CONGRESS,**
Defendant.

Civ. A. No. 86–1784.

United States District Court,
District of Columbia.

March 24, 1987.

Joel P. Bennett, Washington, D.C., for plaintiff.

Linda A. Halpern, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This Title VII race discrimination case came before the Court for a de novo hearing after plaintiff, a black, had exhausted his administrative remedies.[1]

The undemanding burden of establishing a prima facie case was met at the outset as many facts essential for this purpose were stipulated. Plaintiff, Mr. Nance, was a police officer employed by the Library of Congress. He applied for either of two vacancies simultaneously announced by the Library for the position of Facility Manager, GS–9. He was one of nine applicants considered qualified and was interviewed for both the positions. Mr. Nance was not selected. Both positions were filled by white male applicants. The selecting offi-

---

1. Mr. Nance made an oral complaint at the Library in September 1983. For some unexplained reason the initial informal conciliation stage of this complaint was cancelled and thereafter no formal written complaint was filed administratively by Mr. Nance until March 25, 1985. See Pl.Ex. AA. The record now indicates that the Library settled a prior suit filed by Mr. Nance, C.A. No. 84–2908, by agreeing that this cancellation was defective and, as a result, granted Mr. Nance's appeal rights retroactively. Mr. Nance then appealed, without success, and the matter finally came to this Court on a complaint filed June 26, 1986. At trial only the claim of race discrimination was pursued and the claim of age discrimination was affirmatively abandoned.

cial felt he was less qualified than the selectees, Walter L. Hynson and James W. Ferguson. Mr. Nance presented expert testimony supporting his claim that this reason was a pretext and he testified to aspects of his interview and experience as a Marine First Sergeant responsible for aspects of building maintenance.[2]

After a full trial, Mr. Nance's contentions must be examined to determine whether or not he has carried his ultimate burden considering the record as a whole. His counsel offered two primary lines of proof: first, expert testimony was presented rating the qualifications of Mr. Nance superior to the selectees by comparing the Form 171 applications against the Vacancy Announcement; and second, testimony of a few employees was presented designed to suggest that Gerald Garvey, the selecting official, was racially biased.

■ The expert testimony proved to have no probative value and the Court can give it no weight. Mr. Nance's expert presented himself as a rating specialist. His qualifications in this regard were marginal. He had had no experience rating employees of the Library of Congress. He did not know the nature of the Facility Manager's duties, except as they were suggested by the Vacancy Announcement. He made inaccurate assumptions as to what qualities the job entailed, without even knowing the facilities involved or the actual functions of a Manager. Although purporting to base his analysis only upon the written Form 171 applications of the competing candidates, he did not do so, but used information obtained orally from Mr. Nance or based on his own military experience. His conclusions were far from useful because he was unable to provide specific numerical ratings—only ratings in broad and therefore unpersuasive ranges.

Moreover, the proof is clear that rating procedures were not used in the selection process under review at any stage nor was the Library required to use them. If they had been used they could not have been brought to the attention of the selecting official in any event. Ratings are useful primarily to identify those most qualified and thus eligible for interview. Mr. Nance was interviewed. Ratings are, moreover, mechanical and of little value in identifying desired characteristics among qualified applicants. Often, throughout many branches of the federal service, the candidate rated highest on paper is not the candidate who, at the conclusion of an interview, is found most suitable for the vacancy. Inadequate vacancy announcements are often used and they tend to exacerbate the spread between the initial impression of a rater and the final result.

Thus, the precise issue here is whether or not the selecting official, Mr. Garvey, gave pretextual reasons for choosing two whites instead of Mr. Nance. This is a direct challenge to Mr. Garvey's credibility since he testified at considerable length, stating obvious relevant reasons for making the selections he did based largely on uncontroverted facts reinforced by the 171s. Although he was fully cross-examined, his position was not undermined.

■ No basis for disbelieving Mr. Garvey's testimony was presented after consideration of the Vacancy Announcement and his undisputed elaboration of the job requirements. He rejected Mr. Nance's application for two basic reasons.

2. Mr. Nance does not seek reinstatement. Moreover, he was not constructively discharged. *See Clark v. Marsh,* 665 F.2d 1168, 1173–74 (D.C.Cir.1981); *Downey v. Isaac,* 622 F.Supp. 1125, 1132 (D.D.C.1985). He left the Library about seven months after he failed to be selected and made no claim of constructive discharge at the time. Mr. Nance requested a leave of absence for a year, indicating he was planning to study business management in Liberia and might want to return. This was denied. He left because he had twice failed to get a Facility Manager job, having first applied in 1981, and because he needed to improve his education, believing there was no opportunity for him at the Library for "upward mobility." His working conditions admittedly remained otherwise pleasant. His claim is therefore limited to the difference between his pay and benefits as a Library police officer and the pay and benefits he would have received if he had been selected a Facility Manager. This is approximately $7,500.

As Mr. Garvey's contemporaneous interview notes indicated and as Mr. Nance's application further exemplified, Mr. Nance had definite difficulty in expressing himself coherently, both orally and in writing. Mr. Garvey felt this would inhibit Mr. Nance's performance of the significant liaison aspects of the Facility Manager's position, which involved substantial written and personal contact with contractors and other agencies such as GSA and the Office of the Architect for the Capitol.

Moreover, as Mr. Garvey pointed out, Mr. Nance's military record revealed that his activities had not acquainted him with health and code regulations applicable to daily management of a library facility, with cleaning techniques and electrical hookups involved, or with various types of problems that might arise. Mr. Nance had relied on others not under his direct supervision to carry out these and other management functions. Thus he was viewed by Mr. Garvey as having been a user rather than a building operator. Because he had not been a true building manager but relied wholly on others he called in to do the work, and otherwise lacked hands-on knowledge, Mr. Garvey found his qualifications inadequate.

Second, Mr. Garvey pointed out that both whites selected had far more direct hands-on experience with aspects of building management and far more knowledge of health, OSHA and building codes, and were better equipped to handle electrical, humidity and similar problems coming to the attention of a Facility Manager at the Library. Their direct supervisory experience was greater. Neither had difficulty communicating.

In short, Mr. Garvey testified that he filled the two positions with the applicants he believed were best qualified. He indicated that Mr. Nance had a poor interview and exhibited a definite lack of knowledge of elements which he would have to deal with on the job. After all these years Mr. Nance's recollection of the interview is vague and the Court finds it unacceptable.

Mr. Garvey's appraisal of the successful applicants is fully supported by the record, as a comparison of the respective applications of Mr. Nance and the selectees demonstrates. One selectee, Mr. Hynson, was over-qualified in respects which greatly enhanced his value to the Library, as is evident when his outstanding record is measured against the Vacancy Announcement. He was soon hired away from the Library by the Architect of the Capitol into a high-level position. Mr. Ferguson had management experience more closely related to the position than Mr. Nance, and at the interview made a better impression on Mr. Garvey. He was more articulate and his Form 171 specifically addressed his relevant abilities in detail. Before long he too left the Library for better employment.

Given these solid facts, counsel for Mr. Nance chose to focus on Mr. Garvey's credibility in an indirect attempt to establish that Mr. Garvey was and is personally biased against blacks, thus suggesting he was masking his true reasons. This attack involved several aspects, including:

(1) The only Facility Manager at present, Ellsworth Jackson, is a black who has occupied that job for ten years. Mr. Jackson, an obviously bright, competent, valuable employee, testified that Mr. Garvey had failed to promote him and that he has lodged a Title VII claim against him.

(2) In the past on two or three occasions Mr. Garvey has selected a white to be Facility Manager and these whites have advanced to higher responsibilities that were not made available to Mr. Jackson.

(3) Selection procedures had not been validated under the applicable provision of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (1982), as implemented by 29 C.F.R. § 1613 (1986).

(4) The suggestion that blacks and whites were disciplined differently for alcoholism.

In addressing these matters, Mr. Garvey testified to numerous efforts he had made to obtain a higher job classification for Mr. Jackson, whose long experience on the job, obvious ability, and capacity to communicate was demonstrated when he testified

and is not disputed by the Library. While Mr. Jackson's individual complaint was not addressed in all aspects, it appears he is dead-ended by bureaucratic requirements, over Mr. Garvey's objections, at a level distinctly below his worth to the Library. However, his qualifications for certain higher positions to which white Facility Managers have advanced were not established. His is the only discrimination complaint ever filed against Mr. Garvey personally in Mr. Garvey's long tenure with the Library.

Mr. Garvey acknowledged that he had selected only whites for the few Facility Manager vacancies but said he had done so only on the basis of superior qualifications. He explained that apart from the two selectees involved in the selections here under review, the exceptional experience of one white who had previously managed the Smithsonian Air and Space Museum was a special case which accounted for his rapid progress. The other white was chosen as a brief accommodation and only to aid his immediate availability for another job for which he had been already selected by someone else in the Library not accountable to Mr. Garvey for another position in the Library. He was promptly reassigned to the position and did not function as a Facility Manager.

Mr. Garvey was not shown to have had any responsibility for the fact that at the time of the selection the Library utilized selection procedures that had not been validated as required.[3]

The general atmosphere of race prejudice plaintiff sought to infer in this fashion, mostly through innuendo, was flatly refuted by direct evidence from Linda Garrison, Mr. Garvey's Chief Administrative Officer, who was and is responsible for personnel and financing. She is black. She supported Mr. Garvey's testimony concerning his persistent efforts to upgrade Mr. Jackson's job. In addition, she recounted several instances in which Mr. Garvey had taken affirmative steps to counter efforts to elim-inate for budgetary reasons jobs held by black supervisors, and said Mr. Garvey had intervened to prevent nonsupervisory blacks from losing jobs by reductions of force caused by automation.

As to the alleged discriminatory handling of black and white alcoholics, the evidence shows that Mr. Garvey took decisive action as to the white alcoholic supervisor mentioned by plaintiff, within twenty-four hours of the first incident that came to his personal attention. There is no evidence he knew that this white supervisor may have had prior difficulties with alcohol on the job. Moreover, no facts as to the handling of a lower-level black alcoholic were presented to enable the Court to conclude that any difference of attitude or action by Mr. Garvey toward black alcoholics existed.

■ There was no reliable evidence of race prejudice or a negative attitude toward blacks attributable to Mr. Garvey in the record as a whole and not the slightest suggestion of a discriminatory intent on his part. He came through only as a demanding, able manager dedicated to his work, pressed to accomplish difficult tasks without sufficient personnel or appropriations. Thus there was a failure of proof and specifically no proof of race discrimination or pretext. The complaint must be dismissed.

Few discrimination cases brought by federal employees in federal court succeed. There is a pressing need to re-examine the process which is causing expenditure of so much time and expense litigating discrimination complaints without apparent benefit for most federal employees who resort to Title VII. The title is being misused in a futile attempt to resolve what are essentially problems attributable to insensitive personnel management, not to discrimination. This case well illustrates the underlying difficulty so prevalent in discrimination cases arising in this District from federal employment.

Consider this case from Mr. Nance's perspective. He had worked in the Library as a policeman. As he made his rounds he

---

**3.** The Library is an agency of the United States within the meaning of 42 U.S.C. § 2000e–16(a) (1982).

became familiar with the buildings and the day-to-day procedures. He got along well with other people. He came to know Mr. Jackson, a black, who was the Facility Manager. While Mr. Jackson had gone through many changes over ten years on the job, Mr. Jackson's initial background was comparable to his. Both men had been in the military and thereafter were Library policemen. Mr. Nance, commendably, wanted to move up to better pay and more responsibility in the Library. He liked working at the Library. He was improving his education. Knowing what Mr. Jackson's day-to-day duties appeared to involve, he felt he was qualified and sought one of the two vacant jobs when they were announced. There never was any doubt, in his mind, as to his qualifications. Once before, in 1981, he had applied for the same job but the vacancy was cancelled. He was considered qualified and interviewed at that time, and again in 1983, when the two vacancies were posted.

Given his association with the Library and familiarity with the institution he naturally felt discrimination when two whites, neither of whom had any Library experience, were selected. Such a normal reaction could have been anticipated by any perceptive personnel officer. Yet Mr. Nance was given no explanation, no guidance, and was left with every reason to feel slighted because his legitimate desire to advance was wholly ignored. He was never told what the superior qualifications of the selectees were. He was not told he needed to improve his ability to communicate and he was given no training as to how he might improve his Form 171 application (a mysterious art in itself); nor was he steered in the direction of other Library work where his abilities could be used to advantage. Treated presumably like other unsuccessful applicants, white and black, he became another personnel statistic in bureaucratic records and had every reason to feel discarded. Because of his race he attributed his misfortune to discrimination. He had no concrete evidence.

There is nothing in the record of this case to support a claim that this indifference reflected any racial bias. Others who lost out were treated the same, but it probably hurt Mr. Nance more. He came to court because it was the only place he felt he could get someone to consider his problem.

This scenario is fairly typical of federal personnel practice in some agencies and explains why many unsuccessful Title VII suits are filed. The Court's experience over years of hearing scores of such cases brought by federal employees has made it quite apparent that the root cause of the difficulty often lies in the fact the human side of personnel management has been overlooked. Well-meaning regulations and procedures make federal employees mere numbers in a mechanical personnel computer. This degrades federal service, coming as it does on top of often miserly pay.

Federal employees seeking relief in situations like this—and there are many variables—resort to Title VII because they have come to believe no one else will listen to them, show concern, or give advice. As a result, numerous cases wholly without any civil rights significance are filed and must be processed by the federal courts. These employees, who can find no enlightened personnel help within the government, are unintentionally weakening the essential objectives of the Civil Rights Act designed to eliminate true discrimination. When any personnel problem must be labelled race, age, or sex discrimination in order to get attention, genuine forms of discrimination—which still exist and must get the prompt, decisive attention of the federal courts—may get lost in the thicket of mislabeled actions.

Unfortunately, agencies confronted with an employee's personnel problems tend to ignore them if they have been mislabeled discrimination. Knowing that the Title VII label, no matter how far-fetched, will bring the dispute eventually into federal court for a de novo trial, agency personnel officers appear often to make no genuine effort to get at the root of the employee's personnel difficulties—leaving these matters to be addressed at trial.

United States District Court Judges are not personnel officers. They are capable of preserving civil rights under law and are dedicated to that effort. There is much that can be done within the government agencies to improve federal personnel matters in this area which will lighten the load on the courts and improve employee relations in the federal service.

The Clerk of Court shall enter judgment for defendant.