**Naomi HUDSON, Plaintiff,**

v.

**NATIONAL ACADEMY OF SCIENCES, INSTITUTE OF MEDICINE, Defendant.**

Civ. A. No. 90–2882 SSH.

United States District Court, District of Columbia.

March 25, 1993.

Barbara B. Hutchinson, New Carrolton, MD, for plaintiff.

Christopher E. Hassell, Washington, DC, James R. Wright, Audrey Byrd Mosley, National Academy of Sciences, Washington, DC, for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This is a Title VII race discrimination case. *See* 42 U.S.C. § 2000e *et seq.*[1] Plaintiff exhausted her administrative remedies, and a full trial to the Court was held from March 1, 1993, through March 8, 1993.[2] This Opinion sets forth the Court's findings of fact and conclusions of law as required by Rule 52(a).[3] *See* Fed.R.Civ.P. 52(a). As was noted by the late Judge Gerhard Gesell in another Title VII case, "the law is clear and the facts control." *Fuentes v. National Educ. Ass'n,* 752 F.Supp. 487, 487 (D.D.C.1989), *aff'd,* 913 F.2d 981 (D.C.Cir.1990). Based on the credible evidence presented at trial, the Court finds that defendant did not discriminate against plaintiff nor did it retaliate against her for her protected activity.

### Background

Plaintiff, who is black, makes both race discrimination and retaliation claims.[4] First, she claims that she was denied a promotion to financial specialist both because of her race and in retaliation for protected activity under Title VII. Second, she claims that she was harassed in her position as the Division Secretary/Administrative Assistant (Division Secretary) for the Division of Health Sciences Policy (HSP) because of her race and her participation in protected activity. Third, she alleges that she eventually was terminated from defendant, the National

---

**1.** By Memorandum Order of February 25, 1993, the Court granted partial summary judgment to defendant on plaintiff's age discrimination and retaliation claims under the Age Discrimination in Employment Act (ADEA).

**2.** Defendant does not challenge plaintiff's exhaustion of her administrative remedies. The District of Columbia Department of Human Rights (DHR) investigated plaintiff's complaint and determined that there was "no probable cause ... for crediting the Complaint." *See* Def. Ex. 1, at 10 (letter from DHR to defendant, dated August 31, 1990). Subsequently, "[o]n or about November 19, 1990, more than one hundred eighty (180) days having elapsed since the filing of Plaintiff's charges of discrimination, the Plaintiff requested and the United States Equal Employment Opportunity Commission issued Plaintiff a notice of right to sue." Amended Complaint ¶ 20, at 6.

**3.** By agreement with the Court, counsel provided closing arguments rather than submit proposed findings of fact and conclusions of law.

**4.** All of the other persons mentioned in this Opinion are white.

Academy of Sciences (NAS), due to her race and in retaliation for her protected activity.

The NAS is a private nonprofit corporation organized under a charter granted by Congress and signed by President Lincoln. Its primary business is performing studies, approximately 90% of which are funded by government contracts. These studies are short-term, generally taking from a year to three years to complete, although some produce follow-up work. In almost all cases, the government contract funds both clerical and professional staff on these studies. When the funding for a study expires, all staff on the study, clerical and professional, must find new positions or their employment with NAS terminates. Traditionally, many staffers are able to find positions elsewhere in the NAS, although a substantial number do not continue working at the NAS.

Each study is assigned to a major unit within the NAS, and is staffed by qualified people within that unit or by qualified people hired from outside the NAS. Accordingly, positions at the NAS are filled in one of two ways: (1) someone from within the unit may be selected without internal posting or external advertising, or (2) someone may be selected after posting the opening within the NAS and advertising in the Washington metropolitan area.

Plaintiff was employed in clerical positions in various parts of the NAS from August 5, 1974, to May 31, 1991.[5] From June of 1981 to June of 1982, plaintiff worked in the Administrative Office under Louis Cranford, the Director of that office. Although her title was Administrative Assistant/Financial Technician (Financial Technician), she was essentially the secretary for that office of three persons (including plaintiff). Her position level was grade 8.[6] Subsequently, beginning in November of 1983, plaintiff transferred to the Division of Health Sciences Policy (HSP)

in the Institute of Medicine (IOM), a major unit of the NAS. In late February of 1988, Dr. Ruth Bulger became the Director of HSP, thereby becoming plaintiff's supervisor. After the events giving rise to this suit, and effective December 1, 1989, plaintiff transferred from her position as Division Secretary in HSP of the IOM to a project secretary position with the End–Stage Renal Study. She interviewed for this new position, and accepted it when it was offered. This transfer involved a grade level reduction from a permanent grade 9 position to a study-related grade 8 position, but her salary of $29,500 remained the same. When funding for this study expired on March 15, 1991, the IOM offered plaintiff temporary assignments until May 31, 1991, to allow her time to secure other employment. Plaintiff had not found other employment within the NAS by May 31 and her employment terminated as of that date.

### Failure To Promote Claim

#### Discrimination Claim

■ In September of 1988, the NAS advertised two job openings, for newly-created positions 160.010 and 160.011, for financial specialists in the IOM.[7] Plaintiff applied orally for these positions to Janet Stoll in the IOM Administrative Office. Plaintiff was interviewed individually by both Stoll and Cranford, but was not selected. The Court finds that plaintiff has failed to prove that she was qualified for the position or to prove that defendant's reasons for her nonselection were pretextual. Therefore, the Court finds that plaintiff has failed to show that defendant intentionally discriminated against plaintiff. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell*

---

**5.** The Court lists here only the positions held by plaintiff that are relevant to this case. In her early years at the NAS, she worked as a project secretary for particular projects or studies. When these studies ended she usually was approached by someone and asked if she wanted to work on a project that was beginning.

**6.** At the time of this complaint, the NAS had two separate rating systems: the grade (or G) rating

for support staff and the professional grade (or PG) rating for professional staff. All of plaintiff's jobs at the NAS were on the grade scale.

**7.** The title for these positions later seemed to have been changed to Administrative Specialist. *See* Pl.Ex. 43, 45. Consistent with the testimony at trial, the Court refers to these jobs as financial specialists.

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The position description for the financial specialist jobs states that the positions are ranked at professional grade 1.[8] According to the description, the financial specialist was to be "responsible for the coordination of all financial planning and record keeping; personnel administration; payroll; space planning, building services needs; and equipment requirements." Pl.Ex. 43. The major responsibilities of this position were to include "[m]onitor[ing] financial statements, allocations to cost centers, and updat[ing] daily the IOM's cost center analysis, [and] maintaining an accrual accounting system." *Id.* In addition, the financial specialist was to assist in drafting budgets, preparing cost projections, and preparing "financial reports to foundations and Government agencies when necessary." *Id.* Among the qualifications listed were a B.A. degree, or its equivalent, in business administration or a related field, and experience in administrative and financial matters for a major unit. Proficiency in Lotus 1-2-3 for budget and projection preparation was listed as being desirable. Previous experience with the National Research Council, part of the NAS, was also highly desirable. Based on the reliable evidence at trial, the Court finds that the job description reflected the actual duties and necessary qualifications of the financial specialist positions.

Plaintiff possesses a high school diploma and she completed coursework, including Accounting I and II, at Cortez Peters Business College in Washington, D.C. At the time of her application for the promotion, plaintiff's previous experience had been in clerical/secretarial positions. Plaintiff tries to equate her previous job as Financial Technician in the Administrative Office of the IOM with the qualifications necessary for the financial specialist positions. The credible evidence, however, makes it abundantly clear that the job responsibilities were not equivalent and that it in no way prepared her for the financial specialist positions. As Financial Technician, her job involved reviewing all the IOM vouchers for accuracy and compliance with the policies of the NAS (which amounted to checking to see if the sender was allowed certain expenditures and double-checking the addition). These are duties that most of the secretaries at the NAS are required to do. She also maintained a log of contractual requirements (which means she kept a log of all consultants and their financial statements), and double-checked budget totals. Although some of these responsibilities were part of the position description for financial specialist, this experience does not make plaintiff qualified for that position. In the Financial Technician position she did not prepare budgets; she never went over the budgets with directors; she never kept accrual accounting; she did not prepare the financial reports that went to the government; she did not use computer spreadsheet software. Moreover, the Court credits Cranford's testimony that he was familiar with plaintiff and her work and that she was not qualified for the financial specialist position.

In addition, and in the alternative, the Court also finds that defendant has demonstrated legitimate, nondiscriminatory reasons (in addition to the fact that plaintiff was not qualified) for hiring the two white persons selected, Lisa Chimento and Luciana Frost.[9]

8. A move from grade 9 to professional grade 1 would have been a promotion for plaintiff.

9. Plaintiff attempts to show that there were actually three job openings for financial specialist and that she was not informed of this third position in retaliation for her protected activity. The Court finds this contention meritless. The reliable evidence at trial showed that there were only two openings—160.010 and 160.011. Initially, one of these openings was intended to be the financial specialist for the Division of Health Promotion and Disease Prevention (HPDP). This changed, however, when Cindy Abel, the person who was essentially performing the job of a financial specialist for the Food and Nutrition Board (FNB) (and who was expected to continue as its financial specialist without advertisement of the position), requested to be moved to a different division within IOM due to a personality conflict she had with someone in the FNB. (The FNB had recently merged into the IOM.) Because the advertised position and the FNB position were identical except that they served different divisions, Cranford and Stoll agreed to transfer Cindy Abel to financial specialist for the HPDP and position 160.011 became the financial specialist for the FNB instead of the HPDP. After training Frost for the position at FNB, Abel transferred to the HPDP position.

Cranford interviewed and made the final decision to hire Chimento for position 160.-010. Chimento had a B.A. degree in economics from the University of Virginia with a grade point average of 3.25. *See* Def. Ex. 35. She had been the valedictorian of her high school class with a better than 4.0 grade point average. Cranford believed that she had an impressive educational background plus several years' experience working with finances, including spreadsheet experience. Her interview indicated that she understood the type of work required.'

Cranford also testified regarding his reasons for selecting Frost for position 160.011. Cranford believed that Frost had a substantial and extensive financial background and a good education. He testified that he believed she was more qualified than plaintiff, although he admitted that plaintiff was not considered for position 160.011.[10] He also admitted that although Frost had worked on

computers, she did not have spreadsheet experience. One of the most significant factors in Frost's selection, however, was that Frost had experience working for the FNB. This was especially important to Dr. Sushma Palmer, the director of the FNB, who was concerned with the restructuring of the FNB into the IOM, specifically with the change of having the financial specialist report to Cranford rather than to her. Therefore, she wanted someone who had experience in the FNB and whom she knew.[11]

The Court finds that not only is plaintiff unqualified, but that defendant has shown additional legitimate, nondiscriminatory reasons for hiring Chimento and Frost. Plaintiff has produced no credible evidence that these reasons were pretextual.[12] Therefore, on the proof as a whole on her claim of race discrimination in her nonselection for this promotion, plaintiff has failed to meet her burden.[13]

---

**10.** The Court questions whether plaintiff actually applied for position 160.011. She was not listed as an applicant on the applicant flow log for that position. At trial she testified that she applied orally to Stoll for both positions. However, in her initial complaint to the District of Columbia Office of Human Rights (OHR), dated March 23, 1989, she stated that "I discovered that two new Financial Specialist positions were advertised. On September 9, 1988, I applied for one of the positions." Pl.Ex. 1, at ¶ 3(a). Although ambiguous standing alone, the totality of the complaint reads as if she only applied for position 160.010. Later in the complaint she states that "Ms. Chimento was hired for the position that I applied for." *Id.* at ¶ 3(g).

**11.** Although plaintiff attempted to show at trial that Frost's performance after she received the job proved that she was not qualified and therefore that the reasons articulated by defendant regarding her selection are pretextual, the Court finds this contention without merit. First, the Court does not find that the evidence supports the conclusion that Frost was not qualified. Second, even assuming that plaintiff could prove that Frost, once in the job, was not able to perform it adequately, defendant did not know this at her selection. The Court finds totally credible and in no way pretextual, the reasons articulated by defendant, and particularly Cranford who made the final decision. Even if plaintiff could have succeeded in proving that Frost was not qualified, she would have simply buttressed the fact that plaintiff herself (who had less relevant experience than Frost) was unqualified for the position.

**12.** Plaintiff attempts to meet her burden through statistics regarding NAS's hiring, promotion, and rewarding of minorities. *See Cook v. Boorstin*, 763 F.2d 1462, 1468 (D.C.Cir.1985) (noting that statistics can be used in disparate treatment cases to attempt to show pattern of discrimination by defendant or to show pretext). These statistics are inconclusive at best, and indeed suggest that defendant does not discriminate against racial minorities. In any event, these statistics alone, without any supporting credible evidence, fail to prove intentional discrimination against plaintiff. *Cf. Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 993, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988) (plurality opinion) (noting that, in a disparate impact case, "plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force").

**13.** Although as to this claim, plaintiff has failed to establish a *prima facie* case, the Court addresses the case only in terms of the proof as a whole. "[O]nce a Title VII case has been 'fully tried on the merits,' the question whether the plaintiff has established a prima facie case 'is no longer relevant.' ... The High Court has admonished lower courts not to make the inquiry into the ultimate question of fact 'even more difficult by applying legal rules which were devised to govern "the allocation of burdens and order of presentation of proof." ' " *Mitchell v. Baldrige*, 759 F.2d 80, 83–84 (D.C.Cir.1985) (quoting *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093)).

*Retaliation Claim*

Plaintiff also claims retaliation in her nonselection for the promotion. To prove retaliation, plaintiff must demonstrate that there was causation between her protected activity and the adverse employment action. *See Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (quoting *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir. 1984)). The Court finds that this claim is baseless because plaintiff has failed to prove causation. Here, the protected activity was testimony by plaintiff on behalf of a fellow employee at an OHR hearing on November 10, 1988.[14] The credible evidence at trial showed that only two people relevant to this case, Charles Starliper, the Director of Personnel and Appointments at the NAS, and Frances Peter, then the Deputy Equal Employment Opportunity Director, knew about plaintiff's testimony prior to July 27, 1989, when Bulger received a letter from plaintiff, dated July 21, 1989, disclosing her complaint of discrimination and retaliation. The Court finds that neither Starliper nor Peter disclosed plaintiff's protected activity to any of the people involved in the employment actions regarding plaintiff until after plaintiff herself divulged it. Therefore, none of the persons involved in the decisionmaking on these positions, Cranford, Stoll, Palmer, or Bulger, knew of plaintiff's protected activity until well after the selections of both Chimento and Frost. Cranford, the ultimate decisionmaker on both positions, did not learn of plaintiff's testimony until over one year after the decisionmaking on these positions. Therefore, the Court finds that defendant's nonselection of plaintiff for the financial specialist positions was not caused by plaintiff's protected activity, not only because the reasons given by defendant for her nonselection are not pretextual, but also because that activity was unknown to the decisionmakers.

*Harassment and Demotion Claim*

Plaintiff also claims that she was harassed in her job as Division Secretary due to her race and in retaliation for her protected activity "by Defendant's acts of rating Plaintiff's performance as unsatisfactory, excessive monitoring of Plaintiff's work and subsequently demoting Plaintiff." *See* Amended Complaint ¶ 19, at 5. This race discrimination claim too must fail because defendant has shown that there were legitimate, nondiscriminatory reasons for the actions of which plaintiff complains. Her retaliation claim also must fail as the proof at trial was devoid of any credible evidence of causation.

The "harassment" of which plaintiff complains consisted in part of meetings between plaintiff's direct supervisor Bulger, Stoll (who was responsible for personnel issues in the IOM), and plaintiff in which Bulger and Stoll attempted to discuss plaintiff's work performance with her in an effort to help plaintiff meet Bulger's expectations. Plaintiff complains of the two-on-one nature of these meetings and disputes the need for improvement in her work performance. The first of the meetings was held on March 1, 1989. These meetings resulted in a lengthy series of memoranda between plaintiff and Bulger. Plaintiff's memoranda essentially take issue with Bulger's assessment of plaintiff's work performance. Bulger's memoranda outline her concerns and address areas in which she wanted plaintiff to improve.

On March 29, 1989, Bulger placed plaintiff on probationary status scheduled to last until July 1, 1989. Pl.Ex. 11. Plaintiff received this memorandum on Friday, March 31, 1989. Plaintiff came to work the next day, Saturday, and then for part of the day that Monday. She then took salary continuation (a form of extended sick leave) and did not return to the NAS until July 18, 1989. During plaintiff's salary continuation, more memoranda were written.[15] Plaintiff returned in

---

**14.** By this date, Chimento had already been selected for position 160.010. The request for appointment of her to the position was dated November 9, 1988. *See* Pl.Ex. 45–A.

**15.** Bulger wrote a memorandum on April 27, 1989, in response to a letter by plaintiff of April

13, 1989, that Bulger delivered to plaintiff on July 18, 1989, when plaintiff returned from salary continuation. Plaintiff attempts to make much of the time lag between the writing and the delivery of this memorandum. The Court fully credits Bulger's explanation for why she waited to deliver it—that she thought it would not be

July, worked a few days, and then requested and received two weeks of annual leave.

When she returned from annual leave in August of 1989, her probationary period was continued through November 1, 1989, as she had been absent all but a few days of the original probationary period. The meetings resumed, but were not productive because plaintiff refused to discuss her work performance. After defendant told plaintiff that she could not have her attorney with her in the meetings nor could she bring a tape recorder, plaintiff would only respond to Bulger's concerns in writing so that she could have her attorney review her responses. On November 7, 1989, Bulger completed a performance review for the probationary period. She concluded that she could not recommend continuing plaintiff's employ as the Division Secretary. Plaintiff, on November 9, 1989, wrote a rebuttal to this evaluation. As noted above, effective December 1, 1989, plaintiff voluntarily transferred from her position as Division Secretary in HSP of the IOM to a project secretary position with the End–Stage Renal Study. On December 8, 1989, Bond wrote plaintiff a memorandum adopting Bulger's position in her November 7, 1989, evaluation.

Defendant has overwhelmingly carried its burden of articulating legitimate, nondiscriminatory reasons for its actions. The Court fully credits the testimony of Bulger that plaintiff was not fulfilling the basic secretarial tasks she expected her to perform. The Court finds that plaintiff's attempts to show that Bulger's concerns were pretextual are incredible. Plaintiff's testimony, as well as her memoranda and written notes of the meetings, show that plaintiff spent much of her time contradicting her supervisor and making excuses rather than trying to meet her supervisor's expectations and to improve her job performance. Although plaintiff's

past performance ratings generally had been good, other supervisors, both before and after Bulger, had raised some of the same concerns as Bulger. The Court finds absolutely no credible evidence, if any evidence at all, of racial prejudice by Bulger or of any intent by anyone at the NAS to discriminate against plaintiff. The Court finds that Bulger made many attempts to salvage the ever-deteriorating relationship between herself and plaintiff and to help plaintiff meet her demands. Plaintiff did not cooperate with these efforts and instead decided that she was being discriminated against because of her race.

■ As to plaintiff's retaliation claim, plaintiff has failed to prove causation between her protected activity and the alleged harassment. First, as noted above, defendant's actions resulted because plaintiff was not adequately performing her job, not because of protected activity. Second, the timing of defendant's employment actions shows that there was no causal link. Plaintiff claims that her relationship with Bulger began to deteriorate shortly after she testified at the OHR hearing on behalf of a co-worker in November of 1988. The proof at trial, however, showed that plaintiff's relationship with Bulger was, at the very least, strained by as early as June of 1988. The Court finds no evidence that Bulger's treatment of plaintiff was caused by plaintiff's testimony.[16] In addition, the Court finds that Bulger did not know of plaintiff's testimony until August 1, 1989, at which time plaintiff had already been placed on probation.

Likewise, plaintiff's filing of her own complaint in March of 1989 occurred after Bulger had initiated the actions of which plaintiff complains. In addition, as noted above, neither Bulger nor Stoll knew of plaintiff's protected activity until July 27, 1989, when Bul-

constructive or kind to give it to plaintiff until she was well and had returned to work. The Court finds that Bulger did not know of plaintiff's discrimination complaint (or her previous testimony) at the time she wrote or delivered the April 27 memorandum.

16. Although, as noted above, Starliper attended the OHR hearing and therefore was aware of plaintiff's testimony as of November of 1988, the

Court finds that Bulger, not Starliper, initiated the adverse employment actions involved in this claim. Therefore, although Bulger consulted Starliper, as the personnel director, on how to handle the situation with plaintiff, the Court finds that Starliper's involvement was advisory only, and that his knowledge of plaintiff's testimony did not taint (much less cause) the actions of which plaintiff complains.

ger received a letter from plaintiff in which plaintiff mentioned her complaint of retaliation and discrimination.[17] In fact, no one at the NAS learned of plaintiff's complaint until May 15, 1989, the date the NAS received a copy of the complaint. Even by this earlier date, plaintiff had already been placed on probationary status and her working relationship with Bulger was extremely strained. Therefore, the Court finds that there is no reliable evidence that the "harassment" or transfer of plaintiff was caused by her protected activity.

Looking at the situation in retrospect, the Court believes that plaintiff made a greater effort to document that she had a discrimination complaint than she did to address the legitimate concerns of her supervisor. To once again quote the late Judge Gesell, "United States District Court Judges are not personnel officers." *Nance v. Librarian of Congress*, 661 F.Supp. 794, 800 (D.D.C.1987). Often, Title VII is "misused in a futile attempt to resolve what are essentially problems attributable to insensitive personnel management, not to discrimination." *Id.* at 798. In this case, management, far from being insensitive, went to extraordinary lengths to remedy the situation. For her failure to perform the job adequately, her supervisor placed her on probation and eventually recommended her termination. Instead of being terminated, she was offered, and accepted, another position with a one level reduction but the same salary. This is not discrimination.

### Termination Claim

Finally, plaintiff claims that she was discriminated against due to her race and retaliated against because of her protected activity when she was eventually terminated from her position with the NAS on May 31, 1991. The Court finds this claim specious. When plaintiff transferred to the End–Stage Renal Study, she knew that the position expired when the funding for the study ended, which occurred on March 15, 1991.[18] Plaintiff was in the same position as every employee on the study, including her supervisor, Dr. Richard Rettig. When the funding expired, each had to find another position, whether inside the NAS or out. Rettig found another position, and would have taken plaintiff with him, except that his new position did not have a secretary. Plaintiff claims that the discrimination and retaliation are shown, in part, by the fact that Bond did not find her another position. The Court rejects this contention. As noted, the NAS generally hired people in two ways: by an advertised application process or by promoting qualified people from within a particular unit. Bond provided plaintiff with an extra 75 days of employment in which to search for a new position. Plaintiff applied for only two openings at the NAS out of at least eleven openings at the grade 8 and grade 9 levels between January 14, 1991, and plaintiff's termination in May. She was not selected for either of these positions: one was a senior marketing assistant and the other was an administrative secretary/senior program assistant. The record is devoid of credible evidence suggesting that plaintiff's inability to continue employment at the NAS was due to racial discrimination or retaliation. Rather, the Court finds that plaintiff was not able to find employment because she did not make sufficient efforts to obtain it.

### Conclusion

Accordingly, for the reasons stated above, the Court finds that the reliable evidence in this case clearly indicates that there was no discriminatory intent, or retaliatory motive, on the part of defendant in any of the employment actions involving plaintiff. Therefore, the Court finds for defendant on all of plaintiff's claims.

---

**17.** The Court believes Bond's testimony that she also first learned of plaintiff's protected activity when she saw this letter. The Court credits Bond's testimony (and discredits plaintiff's testimony to the contrary) that she did not know of plaintiff's testimony before the OHR at the time of her meeting with plaintiff in March of 1989 and that she did not make a remark at that meeting that indicated that she knew.

**18.** The study was originally scheduled to end in February of 1991, but funding was extended for one month.