Harbans L. DHURIA, Plaintiff,

v.

TRUSTEES OF the UNIVERSITY OF the DISTRICT OF COLUMBIA, Defendant.

Civ. A. No. 91–1119 (JHG).

United States District Court, District of Columbia.

July 27, 1993.

James McConville, Annandale, VA, for plaintiff.

Harbans Dhuria, pro se.

David Cleveland, Office of Corp. Counsel, D.C., Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Harbans L. Dhuria initiated this action against defendant Trustees of the University of the District of Columbia ("UDC"), alleging employment discrimination based on his national origin under both 42 U.S.C. § 1981 and Title VII, codified as amended at 42 U.S.C. § 2000 *et seq.* Professor Dhuria subsequently amended his complaint to include separate claims of retaliation and violations of UDC's rules and regulations. Both parties then filed motions for summary judgment and plaintiff filed a motion to amend his complaint a second time. In a Memorandum Opinion and Order dated December 7, 1992, the Court, *inter alia,* granted Professor Dhuria's motion to amend his complaint and dismissed Dhuria's section 1981 claim. As a consequence, a bench trial was held in March 1993, and following its conclusion, the parties submitted proposed findings of fact and conclusions of law. Upon consideration of the record and evidence introduced at the trial, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had the opportunity to evaluate, judgment is entered in favor of the defendant and against the plaintiff for the reasons stated below.[1]

---

1. Several weeks after the conclusion of the bench trial, plaintiff filed a Motion for Sanctions and Other Relief. Professor Dhuria requested sanctions due to his recent receipt of a 1992–93 evaluation which rated plaintiff as "Less than satisfactory." Essentially, plaintiff complains that the unsatisfactory evaluation constituted further evidence of defendant's discriminatory practices and thus merits sanctions. Nonetheless, because as stated *infra,* the Court has not found any discrimination based on Professor Dhuria's national origin, this motion must be denied.

## FINDINGS OF FACT

### A. *Professor Dhuria's Background*

Professor Dhuria is a United States citizen, born in India. He has been employed at UDC since January 1979, when he was hired as a visiting professor by that institution.[2] Later that year, he was promoted to full-time assistant professor in the Department of Computer Information and Systems Science ("CISS") of UDC's College of Business and Public Management.[3] Then, in 1990, plaintiff was promoted to associate professor.[4] Before arriving at UDC, Professor Dhuria had earned two masters degrees in India, one in economics and one in mathematics, from Delhi University and Punjab University. Later, while at UDC, Professor Dhuria received a doctorate in Information Science from the Northern Virginia Community College ("NOVA") on June 25, 1990.[5] Plaintiff's Exhibits 4, 5.

In 1985, plaintiff received a certificate from the Association for Systems Management which designates him as a "certified systems professional." Plaintiff's Exhibit 2. In the same year, plaintiff was awarded a certificate from the Association of the Institute for Certification of Computer Professionals.[6] Plaintiff's Exhibit 3. He has also benefitted from several grants. For example, in 1984, Professor Dhuria received a grant from the District of Columbia Energy Office which enabled him to hire two UDC students. Plaintiff's Exhibit 6. Then, in 1989, 1990, and 1991, he received grants from the National Aeronautics and Space Administration

---

**2.** He had also worked at one of UDC's predecessor institutions from 1972, when he arrived in the United States, to 1974, when he left teaching to work in the private sector as a computer programmer.

**3.** Although defendant attempted to demonstrate Professor Dhuria's lack of familiarity with various computer languages and programs, its efforts were not fully successful. According to Professor Dhuria, he was very familiar with the different versions of Fortran and WordPerfect. Professor Friedman's testimony to the contrary was not wholly persuasive. That testimony was marked by Professor Friedman's obvious disdain for plaintiff and was not sufficient to overcome Dhuria's contrary testimony. In addition, despite orally impugning the quality of various programs written by Professor Dhuria, defendant offered no evidence, either through an expert or through the programs themselves, that plaintiff had made errors an individual in his position should not have made. Only anecdotal evidence of Professor Dhuria's alleged incompetence was presented and this testimony was problematic due either to the credibility or bias of the individual testifying or because of the time lapse between the class and the events in dispute. For example, Carl Washington ("Washington") currently works for UDC as a computer laboratory assistant and has done so since 1982. He took one of plaintiff's classes in 1984 and opined that Professor Dhuria was a confusing teacher. According to Washington, plaintiff did not understand the subject he was teaching fully and "stumbled" on some of the student's questions. Accordingly, Washington was surprised to learn that Dhuria had received a 100% score from his CISS colleagues that year. Washington also admitted that Professor Friedman is in charge of his yearly evaluations and decides whether to retain him for the following year or not. Moreover, since Washington is not part of the Faculty Association, any decision not to retain him would not be appealable. Professor Friedman likewise testified that plaintiff is incompetent, nevertheless, his animus against Professor Dhuria was so evident that the Court had great difficulty crediting his testimony. Then, Professor Eva Green, a professor in the Department of Accounting at UDC testified that she has taken various courses at the CISS with Professors Momenian, Dolan and Dhuria. According to her, Professor Dhuria was the most confusing and least effective of the other CISS professors. Nonetheless, she is not entirely sure when she took Professor Dhuria's class; she believes it was in 1987—three or four years prior to the incidents in question. Finally, Professor Mehran Pooya, an assistant professor in CISS testified that he took one class with plaintiff somewhere between 1979 and 1981 and he believed that Professor Dhuria's command of his material was insufficient. That course was given almost ten years before the events in this lawsuit arose and thus is of little relevance here. Moreover, it is of considerable interest that UDC never attempted to terminate Professor Dhuria on the basis of his alleged incompetence; indeed it continued to promote him.

**4.** For reasons unclear to the Court, that promotion was awarded retroactive to 1988.

**5.** Friedman testified at some length that Dhuria's degree was not relevant to the computer field. But, that testimony was persuasively refuted by Dhuria's testimony.

**6.** At trial, there was significant discussion regarding the criteria necessary to obtain these certificates. Unfortunately, it was never made clear by either party how an individual can obtain these certificates, and exactly what qualifications are necessary.

("NASA"). Plaintiff's Exhibits 7, 8, 9. The title of the first NASA grant was "the Analytical Study of the Effects of Various Types of Clouds on the Components of the Earth's Radiation Budget." The second title was similar: "The Study of the Effects of Clouds on the Earth Radiation Budget." The third grant was captioned "the Study of the Effects of Clouds on the Earth's Radiation Budget: Seasonal and Inter-annual Patterns." [7] Although each NASA project contained the word "clouds," Professor Dhuria testified convincingly that the projects were computer-based and dealt with computer programming and research. From 1987–89, plaintiff also published several articles in the computer field. Plaintiff's Exhibit 49.[8]

### B. The CISS and its Evaluation Procedures

At the time that the alleged discrimination occurred in 1990 and 1991, the CISS was made up of the following full-time individuals with diverse ethnic backgrounds: Dr. Hazzah (Egyptian); Professor Carl Friedman (American); Professor Eugene Dolan (American); Professor Judy Smith (African American); Professor Alan Truelove (British); Professor Kucera (Czechoslovakian); Professor Mehran Pooya (Iranian); Professor Vita Momenian (Bulgarian). Of the CISS faculty, only Dr. Hazzah, Professor Dhuria and Professor Truelove had received doctoral degrees.[9]

At UDC, faculty evaluations are conducted every year. See Plaintiff's Exhibit 1, at 23. Initially, the Department evaluates the individual through its Departmental Evaluation and Promotion Committee ("DEPC") which consists of three, five, or seven members, depending upon the size of the particular department.[10] Id. The members of the DEPC are elected annually by a majority vote of the CISS members. The DEPC then rates faculty members in its department through the use of four criteria, with respective weights to be awarded expressly set forth in the Fourth Master Agreement. Id. at 24. The faculty member may be rated "Less than satisfactory," "Competent," "Above average," or "Excellent." After the evaluation is conducted, the DEPC's evaluation is submitted to the Department Chairperson who must also rate the faculty member, attaching an addendum if the chairperson's rating is less favorable than the DEPC rating. Id. at 26. After review of the evaluation by the faculty member and the chairperson, the professor may appeal the evaluation within ten working days of meeting with that department chairperson. Id. at 27. The Dean is then required to meet with the faculty member (unless that member waives his or her right to a meeting), and the dean must issue a decision within thirty days of receipt of the appeal. Finally, if still unsatisfied with the evaluation, the faculty member may appeal to the Provost/Vice President for Academic Affairs within ten days. That individual has thirty days in which to issue a decision and the Provost/Vice President's decision is final. The Fourth Master Agreement provides further that "a procedural defect in the evaluation process shall be subject to the grievance and arbitration procedure of Article IX of this Agreement." [11] Id. at 29.

7. Several CISS members, including Professor Friedman, testified that the only CISS faculty member other than plaintiff to receive grants was Professor Friedman.

8. It appears, although it is not entirely clear from the record, that no other CISS members have published articles.

9. In 1992, after the events in issue in this dispute occurred, the CISS hired another Asian Indian professor, Professor Madhu Madhavan; however, Professor Madhavan is a full-time temporary professor and therefore not a member of the collective bargaining unit.

10. Prior to 1991, the CISS DEPC consisted of five members. During the 1991 evaluation period, that number dropped to three.

11. A separate section of the Fourth Master Agreement addresses the grievance procedure and states that a grievance must be filed within ten days of the occurrence giving rise to the complaint or within ten days of the date on which the person filing the grievance knew or should have known of the occurrence. Id. at 9. If the grievance is timely filed, and if it is timely appealed to the President of the University, the Faculty Association may determine whether it wishes to commence an arbitration proceeding. It does not appear that Professor Dhuria ever filed a grievance regarding his lack of a hearing by the Provost/Vice President for Academic Affairs.

## C. *Professor Dhuria's Evaluations*

In 1979, Professor Dhuria received a 96% score on his Faculty Evaluation Profile. Plaintiff's Exhibit 11. Several years later in 1982, the Chairperson of CISS, Professor Dolan commented that:

Students generally agree that Prof. Dhuria is an excellent teacher. He demonstrates a clear knowledge of his subject matter and lends an individual hand when such is needed by the student.... Professor Dhuria is highly respected by his colleagues who, like his students consider him an excellent teacher.

Plaintiff's Exhibit 13. In academic year 1983, he received a 92% score, an overall evaluation of "Excellent" and that evaluation was signed by Professor Friedman as Chairperson of the DEPC. Plaintiff's Exhibit 12. In 1984, Professor Dolan gave plaintiff the highest marks possible on a recommendation for plaintiff's admission to the NOVA doctorate program. Plaintiff's Exhibit 14. Several years later, in 1986, the Chairman's Evaluation submitted by Professor Dolan commented that:

Professor Dhuria has an accent which though not as severe as some, causes problems in understanding. He is available to students outside of his posted officer hours.... Mr. Dhuria is a conscientious instructor but is involved in educational activities to earn a Ph.D which I believe interfere with his teaching.

Plaintiff's Exhibit 16. The evaluation submitted by the DEPC for the 1985–86 academic year gave plaintiff an 82% score which caused him to fall in the "Good" Category. Plaintiff's Exhibit 17.[12] That evaluation was signed by Professor Smith. The following

year (1986–87), plaintiff received a 78% score and a "Satisfactory" rating. Plaintiff's Exhibit 18. Professor Dolan signed that evaluation. Dr. Hazzah, the Department Chairperson then raised the score to 81%. Plaintiff's Exhibit 19.

For the first time, in academic year 1989–90, Professor Dhuria received a "Less than Satisfactory"[13] rating of 54% from the DEPC, whose Chairperson was again Professor Dolan.[14] Plaintiff's Exhibit 22. As chair of the CISS, Dr. Hazzah approved that designation. Professor Dhuria appealed this evaluation to the Dean. Plaintiff's Exhibit 25. Dean Daljit Singh denied that appeal on May 29, 1990 and informed plaintiff of his right to appeal his decision to the Provost/Vice President for Academic Affairs. Professor Dhuria then filed that appeal. Plaintiff's Exhibit 28.

Professor Dhuria also received an "unsatisfactory" rating for academic year 1990–91.[15] The then three-person DEPC gave him a 20.9 score, noting that:

Mr. Dhuria did not comply with instructions relative to submission of materials. The DEPC declined to review submission (see attached). Scores are the result of independently available materials.

Plaintiff's Exhibit 29. Professor Friedman, then CISS chairperson, similarly rated plaintiff as "Less than Satisfactory" with a total score of 48 out of 100. Plaintiff's Exhibit 30. However, the Dean upheld plaintiff's appeal, stating that "it is my opinion that you were not provided ... due process and fair hearing...." The CISS's rating was thereupon reversed with Dean Singh giving Professor Dhuria an 80% score and an "Above Average" rating. Plaintiff's Exhibits 31, 32. Pro-

---

12. He could have been ranked in descending order: Outstanding, Good, Satisfactory, or Unsatisfactory.

13. The rating categories had changed and were now: Excellent, Above Average, Competent, or Less than Satisfactory.

14. Professor Smith, a fifteen-year CISS professor, was a member of the DEPC in 1989–90 and ranked Professor Dhuria in the lower third of the nine CISS professors. She stated further that national origin played no role in Dhuria's evaluation. Professor Pooya was also a member of the

DEPC in 1989–90 and testified that that year the DEPC ranked plaintiff in the bottom third of the CISS professors.

15. Professor Dolan, who has taught in the CISS Department for twenty-one years, served on the 1990–91 DEPC; he ranked plaintiff in the bottom third of the nine CISS professors. He ranked Professors Truelove and Kucera in the bottom third as well. Like Professors Smith and Pooya, Professor Dolan contended that national origin played no role in Professor Dhuria's evaluation.

fessor Dhuria received a score of 63 out of 100, or a "Less than Satisfactory" rating for the 1991–92 evaluation period. Plaintiff's Exhibit 34. That rating was eventually changed by the Provost to "Above average." Plaintiff's Exhibit 36.

As a result of his 1989–90 evaluation, Professor Dhuria did not receive a step increase worth $1,040 for the 1990–91 academic year and was prevented from applying for a promotion.[16] He complains further that he was not permitted to teach the number of summer school courses he should have been allowed in the summers of 1990 and 1991,[17] testifying that, as a general matter, other professors were given two classes while he was permitted to teach only one.

In addition to his dissatisfaction with his evaluations and summer schedules, plaintiff voiced concern that he had never served on the DEPC, because he says the DEPC members evaluate themselves and always give each other excellent evaluations, barring the opportunity for others to serve. Even accepting Dhuria's premise of collegial favoritism, national origin discrimination was not evident. In contrast, Professor Friedman has either been department chairperson or served as a DEPC member every year plaintiff has been a professor at UDC. Likewise, Dr. Hazzah has held either of those two positions every year. Except for one year, Professor Dolan has served as a DEPC member or as the chairperson of the Department.

Plaintiff attributes his difficulties in the CISS to discrimination against individuals of Asian Indian descent.[18] He testified that on November 14, 1990, while discussing a grievance with the dean, Professor Friedman called him "boy" and "guy" in front of the Dean. Professor Nicholas, the union representative, was also present at that meeting. In addition, plaintiff maintains that, on several occasions, in January 1991, Professor Friedman came to his office and called him "Indian cockroach." He asserts further that on August 24, 1991, while he was teaching a Fortran class, Professor Friedman called him an "Indian cockroach" or "cockroach," criticized him in front of the class, and followed him around the classroom. Similarly, plaintiff recalled that in departmental meetings, Professor Friedman would often criticize plaintiff. He states that, on at least seven other occasions, Professor Friedman has called him a "cockroach," "dumb," "incompetent" or told him he would "oust" him from UDC.

### D. Other Testimony

Professor Farooq Bashir, a non-CISS UDC professor, testified that during his arbitration with UDC on November 20, 1991 (he had been terminated), Professor Friedman

---

**16.** Good evaluations were essential to enable Professor Dhuria to apply for a promotion to full professor. In order to apply for the promotion, one must have been an associate professor for five years, have a doctoral degree (or at least 36 credits towards that degree), and must have at least two "above average" evaluations and one "excellent" evaluation for the three years preceding the application for promotion. Thus, because of his evaluations and despite his doctorate, Professor Dhuria would not be eligible for promotion in 1993.

**17.** Although plaintiff asserts that he should have been permitted to teach more than one summer school course and that his inability to do so constituted discrimination, the record does not reflect who was permitted to teach more than one class and who was not. No course schedules were introduced and the testimony as to who taught which classes did not provide illumination. Accordingly, plaintiff's claims regarding discrimination in summer courses fail. Moreover, as plaintiff himself admits, "[d]enial of a summer school assignment may be grievable." Plaintiff's Findings of Fact and Conclusions of Law, ¶ 70. Plaintiff did not file a grievance and cannot attack his lack of summer school assignments as violative of the Fourth Master Agreement.

**18.** He states that the majority of the fifty-five professors in the College of Business and Public Management at UDC are either African American or of Middle Eastern descent. According to Dhuria, of the five Asian Indian professors in that College, two received unsatisfactory ratings. Moreover, several other Asian Indian professors have filed discrimination suits. Dhuria asserted that although Dr. Hazzah once raised his evaluation score one level, he believes that Dr. Hazzah was biased against him because of his national origin. Dean Singh, of Asian Indian descent has also ruled against Dhuria despite being of the same nationality, but Dhuria believes that Dean Singh was not really biased, but merely following his administrators' decision.

admitted that he had called plaintiff an "Indian cockroach" and a "boy." Alan J. Truelove ("Truelove"), currently a computer consultant in private industry, also testified that Professor Friedman has called plaintiff an "Indian cockroach." Truelove was a CISS professor for sixteen years until he was terminated in 1991 while working for a different department in UDC. During the time he was at CISS in 1985 or 1986, he was promoted to full professor and was the only full professor in the Department at that time. Truelove testified that, approximately four times a year, he spent time in Professor Dhuria's classes and believed that Dhuria was very dedicated, knowledgeable, current and painstaking in his teaching.[19] Truelove was on the DEPC in 1987, and he evaluated the evaluation process as a "farce." According to Truelove, there was no discussion of the materials submitted and the "non-doctoral" committee gave each other a 100% score, evaluating each other with the individual under evaluation remaining in the room.[20]

In sum, Truelove deemed the evaluations racially motivated. Moreover, he reported that in 1987 or 1988, Professor Friedman made derogatory remarks to Truelove regarding plaintiff. For example, Professor Friedman reportedly stated that Professor Dhuria was "just an Indian" and he could be forced out of the Department. Also in 1988, Friedman allegedly described plaintiff as an "Indian" and "incompetent." Truelove stated that Professors Friedman and Hazzah had tried to get rid of Professors Dhuria and Kucera because they were foreigners. No one overheard these conversations between himself and Professor Friedman or between himself and Dr. Hazzah.[21]

Professor Samuel F. Carcione, an associate professor of mathematics at UDC and currently the president of the Faculty Association at UDC (the collective bargaining unit), provided highly credible testimony. On behalf of the Faculty Association, he represents all full-time permanent professors at UDC—in other words, those professors who are part of the collective bargaining arrangement. In his representative capacity, Professor Carcione testified that he had been fully involved with plaintiff's grievances since 1986. That year, because of irregularities in conducting student evaluations, the Faculty Association and the acting Provost, Dr. Samuel Sullivan, reached an agreement to reevaluate all CISS professors, and to do so using a neutral third-party in the College of Business. As a result of the second set of evaluations, plaintiff, Professor Kucera, and Truelove received new evaluations. The remaining six CISS professors declined to be reevaluated.

Professor Carcione related that almost every year there were problems in the CISS Department. As example, in 1989, plaintiff met with Professor Carcione several times a semester to determine, *inter alia*, whether Friedman was allowed to come into Dhuria's classroom while he was teaching. In addition, Professor Carcione saw several memoranda written by Professor Friedman to plaintiff, stating that plaintiff had given misinformation in his classes. Because of the frequent conflict between Dhuria and Friedman, Professor Carcione filed several grievances on behalf of Dhuria. As a result of his efforts, two reprimand memoranda written by Professor Friedman to plaintiff were later expunged from plaintiff's records.

In addition, Professor Carcione has heard Friedman in faculty senate and in union meetings talk about plaintiff's incompetence[22], he has heard him "badger" Pro-

---

**19.** Professor Bashir also visited plaintiff's courses several times a semester. In the 1989–90 academic year, he found the class ordinary and Professor Dhuria an effective teacher who has good rapport with students.

**20.** However, Professors Smith, Pooya and Momenian each testified that when the DEPC ranks a DEPC member, that individual must leave the room.

**21.** Professor Truelove exhibited clear bias against UDC. At one point, he remarked that he would never have sought grants for UDC because he thought it was incompetently managed. He made frequent remarks about the "non-doctoral clique" and their bias against Professor Dhuria. He has a civil complaint against the UDC pending before another judge of this Court. In sum, the Court finds his shrill testimony simply not credible in this case.

**22.** He stated that if someone were felt to be incompetent by UDC, the Fourth Master Agreement contains an adverse action procedure

fessor Dhuria and has even had to rule him out of order at these meetings. However, all of these comments by Professor Friedman came in the form of disparaging remarks, not epithets based on national origin. Professor Friedman would make remarks such as: "They need to get rid of you" or "You're no good for this place." Present at these meetings were sixty to eighty people.

Professor Lackland Nicholas, an associate professor at UDC and an attorney also testified, very credibly,[23] on plaintiff's behalf. He is currently chairman of the grievance committee and counsel for that committee, responsible for filing grievances on behalf of association members. He has represented Professor Dhuria several times a semester during the last four or five years, on the frequent occasions that plaintiff has charged Friedman with harassment. Professor Nicholas testified that every year, the same problems arise with Professors Friedman and Dhuria because Friedman simply does not like plaintiff. To illustrate, Professor Nicholas was present in meetings with the deans discussing grievances when Professor Friedman referred to plaintiff as "cockroach," "boy," and "asshole" and called Dhuria a lousy professor. Dean Singh reportedly cautioned Friedman and threatened to send him out of the meeting. Professor Friedman has allegedly made the same types of comments in front of both faculty and students. In another instance, Professor Friedman reassigned to another professor a class originally assigned to Professor Dhuria by Dean Singh. When Nicholas approached Friedman after class regarding the change, Friedman stated in front of the students that plaintiff was a "lousy professor." Ultimately, Professor Dhuria prevailed on that grievance and was permitted to teach that course. Professor Friedman has also said in Nicholas' presence that his goal was to get rid of plaintiff. Approximately one year ago, while Professor Nicholas was representing Professor Bashir in an arbitration, plaintiff's name came up in conversation and Professor Friedman referred to plaintiff as a cockroach. The previ-

ous semester, with Professor Nicholas' assistance, Dhuria had a grievance successfully resolved by the acting Provost. The Provost determined that Professor Dhuria was to be given a step increase and recommended that the union and university establish a system by which Dhuria would not be evaluated by the DEPC.

Professor Friedman, the individual charged with making comments based on national origin, testified that he has worked in the CISS department since 1970. He denies ever calling plaintiff either an "Indian cockroach" or a "cockroach" and states further that an individual's national origin is completely irrelevant to him. He did admit, however, that he has stated that if Dhuria's performance does not improve, he must leave. Simply stated, Friedman fervently believes that plaintiff is incompetent. He also conceded that on one occasion, while talking to Professor Nicholas, he referred to plaintiff as "your boy." He emphatically denies calling Dhuria a "boy." According to Professor Friedman, there was no negative connotation to the phrase "your boy," he just meant that Dhuria had "acted like an idiot." In his mind, UDC owes a fiduciary responsibility to its students and it is his contention that Professor Dhuria's students are being cheated by Dhuria's poor teaching.

In discussing the DEPC's evaluations of Professor Dhuria, Friedman stated that he was not on the DEPC in 1990. Furthermore, that year, he, too—like Professor Dhuria—received an unsatisfactory rating. In fact, plaintiff received higher ratings in 1990 when Friedman was on the DEPC than in 1991, when Friedman was not. Still, Friedman admitted that he, as Department Chairman, affirmed the DEPC's 1991 rating, which rating was later reversed by Dean Singh.

Professor Friedman's conduct toward Professor Dhuria was the subject of multiple memoranda in 1991. In March 1991, the Acting Provost directed Friedman to expunge two reprimands from Dhuria's records on the ground that Friedman had lacked

which could be utilized. This procedure was never brought to bear against plaintiff.

**23.** Professor Nicholas also has a pending grievance now in the District of Columbia Court of Appeals.

authority to issue those reprimands. Plaintiff's Exhibits 47, 48. On June 28th, the Acting Provost wrote Dean Singh to inform him that Professor Friedman's attempt to transfer plaintiff was void because Professor Friedman was no longer CISS's Department Chairperson. Plaintiff's Exhibit 39. Several months later, in August, the three co-Deans wrote Professor Friedman directly in a memorandum entitled "Conduct. Unbecoming a Professional." That memorandum addressed several actions Professor Friedman had tried to take concerning plaintiff and concluded: "Your failure to comply with the conditions described herein will result in appropriate acts being initiated against you." Plaintiff's Exhibit 40.

## DISCUSSION

■ Title VII prohibits an employer from "discrimina[ting] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(a). Disparate treatment occurs under Title VII when a plaintiff demonstrates that his "employer treats some people less favorably than others" because of an impermissible factor such as national origin. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). The order and quantum of proof in disparate treatment cases was articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and its progeny. To succeed initially, a plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In this case, the *prima facie* case of discrimination requires proof that: (1) Professor Dhuria belongs to a protected group; (2) he was qualified for his position; (3) he was adversely treated in spite of his qualifications; and (4) an individual not of the protected group was treated differently.

■ Once a *prima facie* case has been established, a presumption of unlawful discrimination arises, *see U.S. Postal Serv. Bd.*

*of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983), and the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096 (defendant must produce evidence "which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."). Whether this evidence is "ultimately persuasive or not," defendants will have sustained their burden of production and "placed themselves in a 'better position' than if they had remained silent.'" *Saint Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993). Once

the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework with its presumptions and burdens is no longer relevant. To resurrect it later after the trier of fact has determined that what was "produced" to meet the burden of production is not credible, flies in the face of [the] holding in *Burdine* that to rebut the presumption "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture.

*Id.* (citations omitted).

■ "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question:," *id.,* whether plaintiff has "demonstrate[d] that the proffered reason was not the true reason for the employment decision [and] that she has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. To put it another way, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* at 252–53, 101 S.Ct. at 1093. Thus, despite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff. *St.*

*Mary's Honor Center,* — U.S. at ——, 113 S.Ct. at 2748–50; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 462–63.

In this case, the Court assumes *arguendo* that Professor Dhuria has met his initial burden of proof and has established a *prima facie* case of discrimination. As an individual of Asian Indian descent, plaintiff does fall within a protected class and he did receive adverse personnel action. Although certainly not clear that others not within the protected class did not similarly receive adverse treatment (at least half of the CISS Department, of varying national origins, appear to have received at least one or more unsatisfactory evaluations), the Court will, nonetheless, further assume that others not within the protected class did not receive *as much* adverse personnel action as did Professor Dhuria.[24] As already observed Professor Friedman, the individual who allegedly carried an impermissibly discriminatory bias toward Asian Indians, received an unsatisfactory rating at the same time plaintiff did.

The justification advanced by defendant for plaintiff's poor evaluations is poor performance. Defendant contends that Dhuria received unsatisfactory evaluations because his work was unsatisfactory. To support this contention, several of Professor Dhuria's former students—Washington, Professor Green and Professor Pooya—testified that Dhuria was an unorganized professor who was not sufficiently familiar with his course material to teach well. In addition, four professors—Professors Friedman, Dolan, Smith and Pooya—each testified that they ranked Professor Dhuria in the bottom of the CISS professors. In sum, six witnesses testified to deficiencies in Professor Dhuria's performance. Whatev-

er weight is attached to the individual testimony, defendant amply carried its burden of producing evidence of a nondiscriminatory reason for the adverse personnel action taken against plaintiff.

Professor Dhuria, in contrast, has not carried his ultimate burden of persuasion. As stated *supra,* although under the shifting burden scheme of *Burdine,* plaintiff must demonstrate that defendant's proffered reason was not the true reason for the adverse employment action, plaintiff must also prove that he has been the victim of intentional discrimination. In other words, the burden of persuasion remains at all times on the plaintiff.

Attempting to carry this burden, plaintiff offered evidence to counter defendant's contention that he was not a qualified teacher and should have received satisfactory ratings. As example, Professor Dhuria presented his various computer certificates, his grants, his research paper and his doctorate as proof of his eminent qualifications. In addition, Professor Bashir and Truelove testified that they had observed plaintiff's classes and found him a competent professor. Yet, testimony supporting the exact opposite conclusion was produced by defendant. Unfortunately, the murky and voluminous record, does not illuminate whether Dhuria should have received better evaluations—whether he was better qualified at his job than some of his evaluations reflect. At bottom, it was Professor Dhuria's burden to persuade the Court by a preponderance of the evidence that the reason proposed by defendant was a pretext for discriminatory behavior. Professor Dhuria

---

**24.** The CISS Department of UDC reflected an extraordinary working environment, seething with animus and unhappiness and disgruntled faculty awash in a flood of angry internal memos, grievances and ultimately lawsuits. Almost every professor in CISS has received an adverse or unsatisfactory evaluation from the DEPC in one year or another. Even more startling was the fact that five of the witnesses (admittedly three were not CISS members) had initiated job-related complaints either in this Court or in the Superior Court of the District of Columbia; Professors Dhuria, Truelove, Pooya, Nicholas and Carcione all have sued or are in the process of suing UDC. While the numbers of grievances

and lawsuits do not express the merits of those actions, or this one, they do portray the slate on which plaintiff projects his world and his grievances.

An aside: A comment made by Professor Friedman reverberated throughout trial. Friedman explained that UDC owes a fiduciary responsibility to its students—thus, in his mind, justifying his desire to get rid of Dhuria for his alleged incompetence. Whatever duty UDC may owe its students, it is profoundly difficult to grasp how the students' full academic needs can be satisfied in the hostile CISS atmosphere that existed even at the time of trial.

has not met his burden; the Court was not so persuaded.

The witnesses provided by both parties shared credibility deficiencies. The Court found equally undeserving of credence Truelove, one of plaintiff's primary witnesses, and Professor Friedman, defendant's principal witness. While it is unclear *why* Professor Friedman dislikes Professor Dhuria so intensely, there is no doubt that Friedman's animus against Dhuria is personally motivated. It would be speculation to assume, as plaintiff and Truelove both suggested, that Professor Friedman, finding himself extraordinarily well qualified, was jealous of Professor Dhuria's doctorate, a degree Professor Friedman did not possess. Nevertheless, Professor Friedman emphatically denied being motivated by plaintiff's national origin and plaintiff did not establish otherwise. It is impossible to discern whether Professor Friedman gave plaintiff poor evaluations because he believed Professor Dhuria merited them or because he disliked Dhuria. Even were the Court to find that Professor Friedman lied, and it does *not* so find, "to say that [UDC] which in good faith introduces such testimony, or even the testifying · employee himself becomes a liar and a perjurer when the testimony is not believed, is nothing short of absurd." *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2754. As the Supreme Court recently stated, "Title VII is not a cause of action for perjury; we have other civil and criminal remedies for that." *Id.* at ——, 113 S.Ct. at 2754.

Nor were the remaining witnesses' testimony dispositive of plaintiff's capabilities. Numerous UDC faculty members or employees testified that Dhuria was one of the worst professors in the CISS Department. Whether these evaluations were accurate or not, it is obvious that each of these professors/employees independently held that opinion. Even more significant is the fact that Professor Friedman, the only individual alleged to have referred to plaintiff's national origin,[25] was but one of a group of CISS professors charged with evaluating plaintiff. As stated *infra*, Professor Friedman did not have exclusive control over Professor Dhuria's evaluations. In the evaluations in dispute, either a three or five-person committee gave the evaluation, which was then reviewed by another individual. Absolutely nothing in the record supports a finding that these other professors were influenced by an improper Title VII motivation in evaluating Professor Dhuria's work. It was their belief that plaintiff was not well qualified and they evaluated him accordingly.

 In addition to failing to prove discrimination by a preponderance of the evidence, Professor Dhuria has not demonstrated reprisal.[26] A *prima facie* case of reprisal requires that the plaintiff demonstrate that he has engaged in a statutorily protected activity, that the employer took an adverse action and that there was a causal connection between the two. *Barnes v. Small*, 840 F.2d 972, 976 (D.C.Cir.1988) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984)).

25. It has not been proven by a preponderance of the evidence that Professor Friedman ever did call plaintiff an "Indian cockroach." Two witnesses other than plaintiff testified that Friedman had called Dhuria an "Indian cockroach." However, one of those witnesses was Truelove, who had been fired by UDC and whose testimony the Court did not find credible. The second was Professor Bashir, who was also terminated by UDC and who claims to have heard this comment during his own arbitration. Yet, one of the most credible witnesses to testify, Professor Nicholas, was also present at Professor Bashir's arbitration, but Nicholas heard only the word "cockroach," not "Indian cockroach." The Court was also impressed by the forthrightness of Professor Carcione, a witness (totally cognizant of the environment existing in CISS, the relationship between Friedman and Dhuria, and the spokesperson for Dhuria for many years) who testified that, on repeated occasions, he heard Professor Friedman make derogatory remarks about plaintiff, yet, he too, did not hear *any* comments referring to plaintiff's national origin.

26. It is unclear from plaintiff's Second Amended Complaint which was filed *pro se* whether he has raised a claim of retaliation. Count Two of that complaint states that "Defendant has violated Plaintiff's civil rights by retaliating against him both before and after he had sought to protect his civil rights by filing complaints with the EEOC and in U.S. court for the District of Columbia...." Complaint, at 8. Nevertheless, nowhere in Plaintiff's Proposed Findings of Fact and Conclusions of [sic] does plaintiff propose that he has been retaliated against by defendant.

Here, Professor Dhuria has engaged in a statutorily protected activity, as was his absolute right—he protested what he believed to be illegal discrimination resulting in poor evaluations. However, for the reasons stated *supra*, he has not established a causal connection between filing the complaints and receiving poor evaluations. No evidence was presented that the DEPC members even knew that Dhuria had filed an EEOC complaint or initiated this case until after the fact. Nor did Professor Dhuria prove that adverse action occurred after he engaged in this statutorily protected activity. In sum, plaintiff has not demonstrated that he was retaliated against after charging UDC with discrimination.

Accordingly, it is hereby

ORDERED that judgment is entered on the accompanying judgment page in favor of defendant, Trustees of the University of the District of Columbia, and against plaintiff, Harbans L. Dhuria; it is

FURTHER ORDERED that plaintiff's Motion for Sanctions and Other Relief is denied.

IT IS SO ORDERED.