Bhamini M.P. NAYAR, Ph.D., Plaintiff,

v.

HOWARD UNIVERSITY, Defendant.

Civ. A. No. 93–2305.

United States District Court,
District of Columbia.

March 20, 1995.

**17**

John Michael Clifford, Mona Lyons, McLeod, Watkinson & Miller, Washington, DC, for plaintiff.

William David Nussbaum, Janet Pitterle Holt, William Patrick Flanagan, Hogan & Hartson, Susan L. Riley, Washington, DC, for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant Howard University's motion for summary judgment. Plaintiff Nayar, a female born and educated in India, was a faculty member of the Math Department of Howard University from 1984 until 1991 when her

**1.** Plaintiff has agreed not to assert as separate causes of action her pay-disparity claim and her claim for violations of the District of Columbia Human Rights Act ("DCHRA"). In subsequent

application for tenure was denied. Plaintiff sets forth two claims. First, Plaintiff claims that the University discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., because of her sex and national origin. Second, Plaintiff claims that the University breached her employment contract because it did not follow contractually-prescribed procedures when it reviewed her tenure application.[1] Defendant contends that Plaintiff can set forth no evidence to create a triable issue of material fact with respect to either of these two claims.

## FACTUAL BACKGROUND

Plaintiff was hired by Howard University in 1984 for a one year appointment as a Visiting Assistant Professor in the Math Department. In 1985, she was appointed Assistant Professor and held this position until 1991 when she was denied tenure.

Plaintiff's field of specialty is General Topology. She has published ten papers in Indian math journals which are "refereed," meaning that before the paper is published an expert in the field reviews the paper to assess the paper's merit.

In the Spring Semester of 1990, Dr. Nayar met with the Chairman of the Math Department, Dr. James Donaldson, regarding her tenure application. Based on Dr. Donaldson's advice, Plaintiff decided to defer her request for tenure until the following (1990–1991) academic year.

At the time of Plaintiff's application, the University's policies respecting promotion and tenure were set forth in the Faculty Handbook Section of the Howard University Manual ("Handbook"); the Guidelines for Appointments, Promotions, and Tenure Committees ("Guidelines"); and the June 1, 1978 By–Laws of the College of Liberal Arts ("By–Laws"). The University's tenure policy was to be "implemented uniformly in all schools and colleges." Handbook at 62.

proceedings, the Court will determine to what extent evidence supporting these claims is admissible with respect to Plaintiff's existing two claims.

The University's policies make clear that tenure is not automatic. Handbook at 64. Awarding tenure "shall be based on the *judgment of academic and professional qualifications* at all levels of the tenure process, this judgment to result from the careful and continued evaluation of a faculty member during a period of probation." *Id.* at 63 (emphasis in original). The applicant for tenure is to be judged in four areas—research and scholarly publications, teaching, service to the University and community and professional development. Guidelines at 3. In assessing teaching abilities, student evaluations of the candidate are to be taken into account. *Id.*

Several layers of review are built into the tenure evaluation process. First, the applicant is evaluated by a Departmental Committee on Appointments, Promotion and Tenure ("APT" Committee). The evaluation is then forwarded to the college-wide APT Committee through the appropriate Dean. Ultimately, the recommendations are sent to the Vice President and President for presentation to the Board of Trustees. Handbook, at 65–66.

In the Math Department, a subcommittee of three tenured faculty members is assembled to coordinate the review of the candidate's file and to make a report and recommendation to the Departmental APT Committee consisting of all tenured faculty. The University recognizes that "scholars in a particular field or activity have the chief competence for judging the work of their colleagues" and the faculty is to establish procedures to ensure that "such competence" is "exercised before either adverse or favorable judgments are made in this regard." Handbook at 40.

In consultation with Chairman Donaldson, Plaintiff arranged for the following professors to be members of the Math Department subcommittee, the first level of evaluation in the tenure process—Drs. James Joseph, Myung Kwack, and David James. In the summer of 1990, Dr. Donaldson resigned his role as Chairman and Dr. Joshua Leslie was appointed. In August 1990, Dr. Leslie put in place new procedures for the handling of tenure applications. Under the new proce-

dures, the Department Chairman rather than the applicant selects the three subcommittee members. Dr. Leslie appointed a new subcommittee to evaluate Plaintiff consisting of Drs. Neil Hindman (a white male), Cora Sadosky (a white female), and Clement Lutterodt (a black male).

Dr. Hindman wrote a report in which he described what he termed as serious mathematical errors in ten of Dr. Nayar's eleven papers.[2] Plaintiff does not dispute that her papers as published contain "typographical errors, omitted words, and other misprints;" however, she challenges that these errors impinge on the quality of her papers and their significance to her field.

The tenured faculty considered Plaintiff's application at its December 3, 1990 meeting. By mail ballot, the tenured faculty voted against awarding tenure. Thereafter, Drs. Joseph and Kwack petitioned the faculty to reconsider its vote. Another vote was taken and, once again, Plaintiff failed to get a majority of the votes necessary for the recommendation of tenure. Plaintiff then petitioned the University for additional consideration. After review, neither the college-wide committee nor the President recommended tenure. This action followed.

## SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the adverse party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e).

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S.

2. One of these papers was awaiting publication.

317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1....
>
> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have *no* factual basis.

*Id.* at 327, 106 S.Ct. at 2555 (citation omitted).

 The plaintiff, as the non-moving party, is "required to provide evidence that would permit a reasonable jury to find" in his favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) *(per curiam )* (citing *Celotex, supra ).* The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Any factual assertions contained in affidavits and other evidence in support of the moving party's motion for summary judgment shall be accepted as true unless the facts are controverted by the non-moving party through affidavits or other documentary evidence. See Local Rule 108(h).

 In resolving the summary judgment motion, all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202. The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993).

## ANALYSIS AND DECISION— TITLE VII CLAIM

### BURDENS AND ORDER OF PROOF IN TITLE VII CASES

The Supreme Court has articulated the order of proof and the burden of proof in Title VII cases as follows:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reason but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Hence, the first step in analyzing a plaintiff's Title VII claim begins with the evaluation of the plaintiff's prima facie case.

### PRIMA FACIE CASE

 The elements which must be proven as part of a plaintiff's prima facie case depend on whether the case "involves a failure to hire, failure to promote, or retaliation." *Judge v. Marsh,* 649 F.Supp. 770, 779 (D.D.C.1986), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To make out a case for discriminatory failure to promote as alleged in Plaintiff's complaint, the Plaintiff must show that "she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion, and that other employees of similar qualifications who were not members of the protected

group were indeed promoted at the time the plaintiff's request for promotion was denied." *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981).

The University does not dispute that Plaintiff is a member of a protected group and that she applied for and was denied tenure. The University, however, argues that Plaintiff does not provide evidence that she was qualified and that other candidates who were not members of a protected class were promoted at the time Plaintiff was denied tenure.

■ There exist triable issues of material fact regarding Plaintiff's qualifications. Most importantly, several outside evaluators in Plaintiff's field recommended that Plaintiff be awarded tenure and many of the tenured faculty voted for tenure.[3] See *Zahorik v. Cornell University*, 729 F.2d 85, 93, 94 (2d Cir.1984) ("a prima facie case that a member of a protected class is qualified for tenure is made out by a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question.") Second, even though Plaintiff admits that there were errors in some of her published papers, the seriousness of these errors is a question of fact for the jury. Moreover, the accuracy of Dr. Hindman's highly-critical report of Plaintiff's scholarly achievements is a question of fact.

■ As for the fourth prong of the prima facie case, Defendant contends that Plaintiff cannot point to another professor in a non-protected category that received tenure at the time her application was denied. Defendant suggests that the Court must limit the time period to which it can look for purposes of comparison to only that same semester or year that Plaintiff was denied tenure. Not only is such an argument devoid of all common sense, but it is also contrary to established law. If the Defendant's argument were correct, then a University could discriminate against female, Indian professors with impunity as long as the University ensured that no other professors in the department who were in a non-protected class were considered for tenure the same year. As the D.C. Circuit held,

> there can be no absolute precise and uniform time period before and after the denial of the complainant's promotion during which plaintiffs must show that similarly qualified nondisadvantaged employees were promoted. But a Court can certainly determine a reasonable period on the facts of a particular case.

*Bundy*, 641 F.2d at 951.

■ Given the small size of the Howard University Math Department and the dearth of applications for tenure in such a department, the Court finds that the relevant time period includes the several years before and after Dr. Nayar's rejection. The relevant mathematicians for purposes of comparison are the male, non-Indian colleagues who applied for tenure or promotion at the University during this period, which include Drs. Daniel Williams, Dr. Walter Miller and Dr. Paul Peart. At least one of these individuals was promoted to a tenured position.[4] As such, Defendant's position on the fourth prong of the prima facie test must be rejected.[5]

Based on the foregoing, the Court finds that Plaintiff has created triable issues of fact with respect to her prima facie case.

### LEGITIMATE, NON–DISCRIMINATORY MOTIVE

■ Once the prima facie case has been established, the burden shifts to the Defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Department of Community Af-*

---

3. Plaintiff submits as evidence several of the outside evaluators' comments in Exhibit 7 to Plaintiff's Opposition. Defendant does not dispute that some of the outside evaluators recommended tenure. Nor does Defendant dispute that in the mail vote held after the December 3, 1990 meeting that seven out of seventeen tenured faculty members voted for tenure.

4. It is undisputed the Dr. Williams received tenure. The parties failed to inform the Court as to whether the other two individuals were promoted to tenure.

5. The issue of whether the members of the non-protected group have similar qualifications to Plaintiff is a question of fact for the jury.

*fairs v. Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. The University has created a triable issue of fact by pointing to Dr. Hindman's report regarding errors found in Plaintiff's publications.

## PRETEXT

 When the Defendant has articulated a legitimate, non-discriminatory reason, the burden then shifts back to the Plaintiff to show that the articulated reason is merely a pretext for sex or national origin discrimination. *St. Mary's Honor Center v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). If Plaintiff can show that Defendant's actions were more likely than not motivated by their desire to discriminate against Plaintiff, then the jury must find for Plaintiff. If the Plaintiff establishes by a preponderance of the evidence that the defendant's proffered reasons were not true, then the jury may infer that the real reason for defendant's action was discriminatory and find for Plaintiff, although it is not required to make this finding. *Id.* at —, 113 S.Ct. at 2749.

 There exist triable issues of fact regarding whether Defendant's actions were motivated by their desire to discriminate against Plaintiff based on her sex and national origin. First, Plaintiff provides evidence that male, non-Indian professors in the applicable comparison group were treated more favorably in the tenure application process. For example, Plaintiff contends that Chairman Leslie appointed members to her subcommittee that were not the most qualified in her specialty and specifically removed from her subcommittee experts in her field who were familiar with her work. On the other hand, one of Dr. Williams' co-authors, with whom Dr. Williams is presumably friendly, was appointed to his subcommittee. In addition, Dr. Williams, who was originally denied tenure, was allowed to remain on staff until his application was reconsidered and he was given tenure. Plaintiff was not given such an option.

Plaintiff also provides evidence of procedural irregularities in the review of her application. According to the D.C. Circuit, "the adherence to or departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true motivation behind the hiring decision of the prospective employer." *Johnson v. Lehman*, 679 F.2d 918, 922 (1982) (case involving age discrimination). It is University policy to evaluate a tenure candidate on the basis of four areas, including teaching. Student evaluations of a professor are to be considered when analyzing the professor's teaching capabilities. In this case, Dr. Nayar's student evaluations were not included in her file. See Plaintiff's Exhibit 4, attached to Plaintiff's Statement of Evidence.

With respect to national origin discrimination, Plaintiff sets forth evidence that faculty members viewed Indian math journals, in which she had published the majority of her papers, to be of inferior quality. Plaintiff's Exhibit 19 at 22–23, attached to Plaintiff's Opposition. Specific to sex discrimination, Plaintiff provides evidence that she and other female faculty members were paid less than male colleagues. See Exhibit 1 to Plaintiff's Statement of Evidence.[6] To what extent these male colleagues were similarly situated to the female math professors is a triable issue of fact.

## DECISION

Based on the foregoing analysis, the Court finds that there exist genuine issues of material fact that prevent the Court from summarily adjudicating the Title VII claim in Defendant's favor.

## ANALYSIS AND DECISION— BREACH OF CONTRACT

In addition to her Title VII claim, Plaintiff also asserts that the University breached her employment contract when it failed to adhere to the provisions governing review of tenure applications. Plaintiff contends that the following provisions were breached: 1) "The tenure policy of the University shall be implemented uniformly in all schools and col-

---

**6.** As mentioned at the outset, Plaintiff is not asserting a separate pay disparity claim.

leges;"[7] 2) "The award of tenure shall be based on the *judgment of academic and professional qualifications* at all levels of the tenure process, this judgment to result from the careful and continued evaluation of a faculty member during a period of probation." (emphasis in the original);[8] 3) that the Plaintiff is to be judged in the "areas of teaching, research and publications, and service to the University and the community;"[9] 4) that an evaluation of the candidate's teaching should include "student and peer evaluation;"[10] and 5) that the Faculty is to establish procedures to ensure that the reviewing committee is competent to judge the work of the applicant and that this "competence should be exercised before either adverse or favorable judgments" are made.[11]

## UNIFORM APPLICATION

■ As discussed in relationship to the discrimination claim, Plaintiff presents evidence which creates triable issues of fact as to whether the University's tenure policy was applied uniformly to the applicants for tenure within the Math Department.[12] Plaintiff sets forth evidence that Dr. Williams was treated more favorably than Plaintiff in that the make-up of his subcommittee included a co-author and he was allowed to remain at the University for several years until he reapplied for tenure. Plaintiff also presents evidence that the University did not uniformly apply its policy of considering student evaluations when assessing an applicant given that Plaintiff's student evaluations were not in her file.[13]

## CONTINUED AND CAREFUL EVALUATION

■ Whether Plaintiff's denial of tenure resulted from careful and continued evaluation is a triable issue of fact. The accuracy of the Hindman report, to what extent it was relied upon, and whether other faculty

members reasonably relied on this report are questions of fact for the jury with respect to the breach of this contract provision. In addition, whether the faculty adequately considered all four criteria (teaching, scholarship, service to the University and community) is a question for the jury.

## FOUR CRITERIA/STUDENT EVALUATIONS

■ Plaintiff creates triable issues of fact regarding whether all four criteria were adequately considered. As mentioned previously, Plaintiff sets forth evidence that the student evaluations were not in her file.

Moreover, the evidence that Plaintiff sets forth with respect to her discrimination claim also creates triable issues as to the real factors taken into account when the faculty denied Plaintiff tenure. The D.C. Circuit has held that a plaintiff would "make out a valid, non-time-barred contractual claim if he were able to show that the University disposed of his claim in 1985 for reasons *unrelated* to whether he actually merited promotion (e.g., bias, use of improper criteria and the like)." *Kyriakopoulos v. George Washington University*, 866 F.2d 438, 445 (D.C.Cir.1989) (emphasis in original). Thus, if Plaintiff demonstrates that the real reason she was denied tenure was because she was a female from India, then Plaintiff would make out a valid contract claim that the four merit-based criteria were not really considered.

## COMPETENCE OF COMMITTEE

■ Whether the subcommittee was competent to judge Plaintiff's work is a question of fact for the jury. It is for the jury to decide whether those on the subcommittee could read and comprehend Plaintiff's papers and evaluate the degree to which these papers constituted significant contributions to

7. Handbook at 62.

8. Handbook at 63.

9. Guidelines at 3.

10. Guidelines at 3.

11. Handbook at 40.

12. With respect to the breach of contract claim, Plaintiff need not prove that the University's lack of uniform application of the tenure policy was for discriminatory reasons. To prove this claim, Plaintiff could provide evidence that the tenure policy was applied differently to another female, Indian math professor.

13. See, *supra*, section entitled "Pretext."

Plaintiff's specialty and to the field of mathematics generally.

## DECISION

Based on the foregoing analysis, the Court finds that there exist genuine issues of material fact which prevent the Court from summarily adjudicating the breach of contract claim in Defendant's favor.

## CONCLUSION

Where the adverse party "set[s] forth specific facts showing that there is a genuine issue for trial," the moving party is not entitled to judgment as a matter of law. Fed. R.Civ.Pro. 56(e). In this case, the Court held two hearings on Defendant's motion for summary judgment and required the parties to file supplemental submissions detailing the evidence supporting their respective positions. Based on the oral argument and the papers submitted, the Court is satisfied that Plaintiff has created triable issues of material fact with respect to both the Title VII and breach of contract claims.

An appropriate order accompanies this memorandum opinion.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Howard University's motion for summary judgment. The Court finds that there exist genuine issues of material fact with respect to both the Title VII claim and the breach of contract claim. Accordingly, the Court hereby **ORDERS** that Defendant's motion for summary judgment be **DENIED.** The case has been reassigned to Judge James Robertson for all further proceedings.