Juanita BATSON, et al., Plaintiffs,

v.

Earl A. POWELL, Director, National
Gallery of Art, Defendant.

Civ. A. No. 94–2225 SSH.

United States District Court,
District of Columbia.

Jan. 11, 1996.

Barbara B. Hutchinson, New Carrollton, MD, for plaintiffs.

Asst. U.S. Atty. Barbara J. Valliere, U.S. Attorney's Office, Washington, DC, for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are plaintiffs' motion for class certification, defendant's response and plaintiffs' reply, and defendant's motion to dismiss, or in the alternative, for summary judgment, plaintiffs' response, and defendant's reply. The Court denies plaintiffs' motion for class certification and grants defendant's motion for summary judgment in part. Although findings of fact and conclusions of law are unnecessary when ruling on a summary judgment motion, Fed.R.Civ.P. 52(a), the Court nonetheless sets forth its reasoning, partly because this Opinion does not fully dispose of the case.

## BACKGROUND

### I. Parties

Plaintiffs, Juanita Batson, Latina Bailey, Marjorie Harvey, Tawania Harvey, Valarie Mathis, and Altina Sumter, were employed or remain employed as security guards at the National Gallery of Art (NGA) in Washington, D.C. They sue under 42 U.S.C. § 1981a and 42 U.S.C. § 2000e–16, or Title VII, § 717 of the Civil Rights Act of 1964, claiming: (1) defendant's dress code adversely impacted upon females; (2) defendant wrongfully treated males differently than plaintiffs; and (3) defendant retaliated against plaintiffs for filing a discrimination complaint. Defendant Powell is the NGA's director. He is sued in his official capacity, pursuant to 42 U.S.C. § 2000e–16(c).

### II. Uncontested Facts

#### A. The Uniform Dress Policy

On October 1, 1992, the NGA's Office of Protection Services (OPS) issued Guard Force Order No. 12, a Uniform Dress Policy (UDP) requiring each security officer to wear a clean, complete uniform and to maintain a neat and orderly appearance while on duty. Between October 6 and 13, 1992, all security guards employed by OPS, including plaintiffs, were issued a copy of the UDP.

Specifically, the UDP required OPS guards to wear black, military-style shined shoes with plain black or navy blue socks. Uniforms had to be neatly pressed, with all badge and metal work cleaned. Hair was to be kept clean, neatly styled, and arranged so that it did not extend over the collar. Caps were to be worn squarely on the head. Beards or moustaches were to be neatly trimmed. Nose jewelry, dangling earrings, and earrings larger than the size of a lead pencil's eraser were not permitted; also, no more than two earrings per ear, or two rings per hand, were allowed, and neck jewelry could not be openly displayed. Excessive facial makeup, unreasonably long fingernails, and decorative nail polish were prohibited.

#### B. Enforcement of the Uniform Dress Policy

OPS supervisors began enforcing the UDP approximately three months after it was issued. OPS supervisors inspected their squad's appearance each day prior to public hours. Guards found in violation of the order were counseled.[1] If the offending guard complied immediately, or on the next day of duty, no further disciplinary action was taken.

Thirteen males were found to be in violation of the UDP during the period it was enforced. Male offenders were counseled for violating the earring clause, the hair clause, the sock clause, and the shoe clause. Except in one instance,[2] these violations were cor-

---

1. "Counseling" meant that a supervisor would inform an offending guard as to which condition of the UDP he or she was violating, and would make clear that further disciplinary action in the form of formal reprimand, charge of absence without leave, and suspension could result from failure to comply.

2. Officer W.R. Richardson was permitted to wear sneaker-like shoes in violation of UDP requirements for medical reasons, after he provided appropriate medical documentation.

rected immediately, or by the next day, so no male guard was disciplined. Over the same period, 13 female guards (six of whom are the plaintiffs in this action) were found to be in violation of the UDP. Female offenders were counseled for violating the nose ring clause, the hair clause, the sock clause, and the earring clause. Each of these offenses was either corrected immediately, or by the next day, so no female non-plaintiff guards were disciplined.

Among the plaintiffs, M. Harvey was first to be counseled. On January 6, 1993, she was warned that her dangling earrings were non-conforming. Batson was counseled for wearing her hair over her collar on February 14, 1993. Bailey also was counseled for a hair clause violation on March 1, 1993. Mathis was counseled for violating the earring clause, and Sumter was counseled for violating the hair clause on March 21, 1993. T. Harvey was counseled for violating the cap and hair clauses on March 22, 1993. Unlike the other counseled guards, plaintiffs failed to immediately or soon after comply with the UDP requirements. For each successive instance of offending behavior, they were subjected to further disciplinary action, and each plaintiff was formally reprimanded on more than one occasion. All were sent home and charged absence without leave. Batson, Bailey, Mathis, and Sumter were suspended from duty without pay. Batson, M. Harvey, and Mathis ultimately were terminated.

### C. Cancellation of the Uniform Dress Policy

On November 30, 1994, a Federal Labor Relations Authority Administrative Law Judge determined the NGA violated the Federal Service Labor–Management Relations statute when drafting the UDP. After this finding, the order was no longer enforced. On December 19, 1994, the OPS issued a memorandum to all staff officially rescinding the order.

### DISCUSSION

### III. *Plaintiffs' Motion for Class Certification*

Plaintiffs seek to maintain their suit as a class action by a class consisting of all female guards employed by the NGA since January 1, 1992, and filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23(c)(1) on January 31, 1995. Defendant opposes their motion, and requests it be denied as untimely.

■ Local Rule 203(b) of this court provides that "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action, unless the Court in the exercise of its discretion has extended this period, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case may be so maintained." Plaintiffs filed their class complaint with the Court on October 14, 1994, but did not file their motion for class certification until January 31, 1995, 110 days after they filed their complaint. As this Court has made clear, the 90–day limit of Local Rule 203(b) has been "strictly enforced in this Circuit." *Weiss v. Int'l Bhd. of Elec. Workers,* 729 F.Supp. 144, 148 (D.D.C.1990); *accord McCarthy v. Kleindienst,* 741 F.2d 1406, 1411 (D.C.Cir.1984) ("[I]t would manifestly be within the District Court's discretion to refer to the [local] rule as a non-binding benchmark against which the timeliness of a class certification motion could be measured"); *Coffin v. Secretary of Health, Educ., and Welfare,* 400 F.Supp. 953, 956–957 (D.D.C.1975). Plaintiffs, relying on *Chambers v. McLean Trucking Co., Inc.,* 550 F.Supp. 1335, 1345 (M.D.N.C.1981), contend the Court should not dismiss their motion for untimeliness without a showing of prejudice to defendant. Although defendant claims to have been prejudiced by plaintiffs' failure to move for certification within the time frame required by the local rule, as he treated the complaint as being brought only by the named plaintiffs for purposes of his alternative motion, he certainly had the opportunity to know plaintiffs' intentions.[3] Nonetheless,

---

3. Plaintiffs' claim was treated as a class claim at the administrative level, and defendant has known plaintiffs were pursuing a class claim since at least May 6, 1993, when plaintiffs so notified Cathy Yates, the NGA's EEO officer.

plaintiffs fail to offer a compelling reason why the Court should not follow the local rule in this case. Plaintiffs' motion for class certification was filed 20 days later than required. Had they moved for an enlargement of time in which to respond, as allowed by the comment to Rule 203(b) as amended on October 10, 1990,[4] the Court could have excused them from Rule 203(b)'s 90–day requirement. Since plaintiffs did not take advantage of the available procedures, they have failed to satisfy the timeliness requirements of Local Rule 203(b). Plaintiffs' motion for class certification is denied.

## IV. Defendant's Motion for Summary Judgment

■ Defendant has moved to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), and, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Both parties have presented exhibits and affidavits to the Court which the Court has considered in deciding the matters before it. As the last sentence of Rule 12(b) provides, a motion to dismiss is to be treated as a motion for summary judgment whenever matters outside the pleadings are presented to and not excluded by the Court. Fed.R.Civ.P. 12. Accordingly, defendant's alternative motion will be treated as a motion for summary judgment. *See Evanson v. United States,* 878 F.Supp. 1, 2 n. 3 (D.D.C.1995); *Szymkowicz v. Dist. of Columbia,* 814 F.Supp. 124, 126 n. 2 (D.D.C.1993).

■ Summary judgment may be granted when the pleadings and evidence demonstrate there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). All evidence and the inferences drawn from it must be considered in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *White v. Fraternal Or-*

*der of Police,* 909 F.2d 512, 516 (D.C.Cir. 1990). If divergent inferences can be drawn from the material facts bearing upon an issue critical to the disposition of the case, or if the facts before the Court allow a reasonable jury to return a verdict for the nonmoving party, summary judgment cannot be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Alyeska Pipeline Serv. Co. v. E.P.A.,* 856 F.2d 309, 314 (D.C.Cir.1988). By pointing out the absence of evidence to support the nonmoving party's case, the moving party can demonstrate there is no genuine issue as to any material fact, so it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). However, since proof of discrimination and disparate treatment is difficult for plaintiffs to establish, summary judgment motions in employment discrimination cases should be viewed with special caution. *Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993).

### A. Plaintiffs' Disparate Impact Claim

■ Title VII designates characteristics of race, color, religion, sex, and national origin for protection. 42 U.S.C.A. § 2000e–2(a)(2). The Supreme Court has read Title VII to prohibit a facially neutral employment practice or rule from having an adverse impact on a protected class of persons. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645, 109 S.Ct. 2115, 2118–2119, 104 L.Ed.2d 733 (1989); *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Disparate impact plaintiffs need not show intentional discrimination or discriminatory motive on the part of their employer to pursue a Title VII claim. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Griggs,* 401 U.S. at 429, 91 S.Ct. at 853. To advance their challenge to defendant's facially neutral dress policy on Title VII grounds, plaintiffs must first establish a prima facie case by showing that the UDP had a substantially disproportionate impact on the protected class of female guards. *See Connecti-*

---

4. The relevant section of this comment states, "[t]his amendment makes clear that the Court

may enlarge the 90–day period within which the motion for certification is to be filed."

*cut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786 (1977). Their allegations must be supported by statistical evidence of a kind and degree sufficient to show adverse impact, *Watson*, 487 U.S. at 994, 108 S.Ct. at 2789, which must be proved with empirical data. Mack A. Player, *Employment Discrimination Law*, § 5.46(a) at 397 (1988).

■ Plaintiffs have presented no empirical data or significant statistical evidence showing the UDP disproportionately impacted upon the female guards. They claim only that the UDP's conditions disproportionately impacted upon the female guards as evidenced by the fact that six female but no male guards were disciplined for violating the UDP. The fact that six females and no males were disciplined for violating the dress policy, even when viewed in the light most favorable to plaintiffs, does not give rise to an inference of disproportionate impact.

■ Such a finding would confuse the goals behind Title VII legislation with pure statistical evidence. Title VII protects classes defined by certain immutable traits identified by statute and possessed by certain individuals. Traits or factors specifically within an individual's control are not necessarily protected. All that plaintiffs' evidence shows is that six persons, who all happen to be female, chose not to comply with written and verbal orders. Arriving at work in compliance with a dress policy is a matter wholly within a person's control, unlike, for example,

an intelligence test unrelated to job performance. *See* Mack A. Player, *Employment Discrimination Law*, § 5.41 at 388 (1988) ("Generally, rules relating to grooming do not adversely affect employment opportunities of other classes because such rules do not comprise irremovable obstacles to employment. The applicants can always change clothes or trim their hair"). In addition, plaintiffs' own evidence shows that at least 41 female guards worked at the NGA during the period the UDP was enforced. Only six were disciplined. Statistical disparities must be significant or substantial to show disparate impact. Without a significant statistical showing, no inference of disparate impact is warranted. *Morgan v. Harris Trust and Sav. Bank of Chicago*, 867 F.2d 1023, 1028 (7th Cir.1989). In *Morgan*, the court found evidence showing that 25 employees were administered a polygraph exam, that five failed the test twice, that each of the five was black, and that each of the five was fired was not enough to establish a prima facie case. Here, evidence showing that six females and no males were disciplined for violating a work rule similarly fails to qualify as a significant statistical showing.[5] Plaintiffs have failed to make out a prima facie case. Defendant's motion for summary judgment is granted as to plaintiffs' disparate impact claim.[6]

### B. *Disparate Treatment*

■ Title VII prohibits employers from differentiating on the basis of proscribed criteria, including gender, when taking punitive action against employees for vio-

---

**5.** Evidence showing that significantly more females than males were initially counseled for dress code violations may have raised a presumption, however minimally significant, that the neutral rule had a disproportionate impact on a protected class. However, defendant has produced statistical evidence showing that this was not the case; in the period that the order was enforced, equal numbers of males and females were counseled. (Def.'s Mot. for Summ. J.Ex. B, Aff. of Captain James Thompson.)

**6.** Since plaintiffs have failed to establish a prima facie case of disparate impact discrimination, the Court need not address whether the defendant's dress policy satisfies the requirements of "business necessity" and "legitimate interest," a

showing of which becomes defendant's burden once plaintiffs make out a prima facie case. *Dothard*, 433 U.S. at 329, 97 S.Ct. at 2726–2727. Nonetheless, the Court notes that a dress policy applied uniformly, and enacted with the idea that guards should maintain a neat appearance to reinforce their authority and because they are highly visible to the public visitors to the gallery, is reasonably related to the employer's legitimate interests. *See Wislocki–Goin v. Mears*, 831 F.2d 1374, 1380 (7th Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1113, 99 L.Ed.2d 274 (1988); Stephen N. Shulman and Charles F. Abernathy, *The Law of Equal Employment Opportunity*, ¶ 5.04[1][c] at 5–60, 5–61 (1990); Mack A. Player, *Employment Discrimination Law*, § 5.58 at 424–425 (1988).

lating work rules or conditions. *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282–283, 96 S.Ct. 2574, 2579–2580, 49 L.Ed.2d 493 (1976). When members of a certain class are disciplined under circumstances in which an employee of another class would not have been disciplined, an inference of discrimination arises. *E.E.O.C. v. Brown & Root, Inc.,* 688 F.2d 338, 340 (5th Cir.1982). Unlike a disparate impact claim, under a disparate treatment theory, plaintiffs must prove that defendant's intent was discriminatory. *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

◼ Plaintiffs have not presented direct evidence showing defendant was motivated by discriminatory gender considerations. Instead, they have elected to employ the familiar three-step model of proof available to Title VII plaintiffs set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* model, plaintiffs bear the "initial burden ... of establishing a prima facie case" of gender discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Although *McDonnell Douglas* set forth the elements plaintiffs needed to show to establish a prima facie case in the hiring context specifically, the Supreme Court has stressed that elements of a prima facie case are flexible and must be adapted to the particular facts of the case at hand. *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Courts have modified the *McDonnell Douglas* elements accordingly, although neither the Supreme Court nor this Circuit has precisely defined the elements plaintiffs must show to establish a prima facie case when alleging disparate treatment in the enforcement of a facially neutral work rule such as the UDP plaintiffs challenge in this case.

◼ However, this Circuit and other courts have determined that for plaintiffs to make out a prima facie case where they claim discrimination in the administration of disciplinary action, they must prove that employees outside of their protected group were not punished in a similar fashion. *Plummer v. Bolger,* 559 F.Supp. 324, 329 (D.D.C.), *aff'd,* 721 F.2d 1424 (D.C.Cir.1983) (citing *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980)); *cf. Wilmington v. J.I. Case Co.,* 793 F.2d 909, 915 (8th Cir.1986) (plaintiffs must show the discipline imposed on those in the protected group was harsher than that imposed on those comparably situated, but outside of the protected group); *Moore v. City of Charlotte,* 754 F.2d 1100, 1105–1106 (4th Cir.), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985) (plaintiffs must show that disciplinary measures enforced against them were more severe than those enforced against others similarly situated, but outside of the protected group).[7] In light of the Supreme Court's admonition to adapt elements of the prima facie case to the particular facts of the case at hand, and because the Court finds that this case is very similar to the administration of disciplinary action cases, plaintiffs must show that they were similarly situated to the male guards and that defendant dissimilarly treated the two classes of employees in order to make out their prima facie case.

◼ Plaintiffs' disparate treatment argument rests on this premise: although the NGA implemented a facially neutral dress policy that was to be uniformly applied, in fact, the UDP was applied in such a way as to allow male guards options not offered to plaintiffs, so that male guards could comply with defendant's order in ways plaintiffs could not. Although facially neutral, the policy was not applied evenhandedly to males and females, as females were held to a more exacting standard. In support of their claim, plaintiffs offer the following evidence:

---

**7.** Plaintiffs could also succeed in establishing a prima facie case if they could prove that they did not engage in the conduct for which they were disciplined. *Plummer,* 559 F.Supp. at 329. Here, plaintiffs do not contest that they engaged in conduct proscribed by defendant's UDP.

(1) Captain Thompson and Deputy Chief Davis of the Guard Force told plaintiff Sumter, and other female guards, that in order to comply with the order they would have to cut their hair. No other options were offered. (Pls.' Statement of Genuine Issues Attach. 3, Aff. of Altina L. Sumter.)

(2) Male co-workers were not given the same orders. (Pls.' Statement of Genuine Issues Attachs. 3 and 5, Aff.'s of Sumter and Ralph Wright.)

(3) At least one male guard, Willie Wright,[8] who wore his hair in a ponytail which extended to his waist, was allowed to place his hair inside his coat, so that the ponytail was not showing outside of the coat. (Pls.' Statement of Genuine Issues Attach. 4, Aff. of Willie Wright.)

(4) Sergeant Powell of the Guard Force told plaintiff Batson that because Wright was on another shift, nothing could be done concerning his compliance with the order. (Pls.' Statement of Genuine Issues Attach. 1, Aff. of Batson.)

■ These alleged facts, assumed true for purposes of ruling on defendant's summary judgment motion, show that at least one male guard and plaintiffs both had hair long enough to extend over the collar and styled so that it would, in fact, extend over the collar in violation of defendant's UDP on its face. These facts, if true, show that defendant treated plaintiffs and at least one male guard dissimilarly in that plaintiffs were told they would have to cut their hair in order to comply with the UDP. Thus, plaintiffs' evidence raises a presumption of discrimination and they have satisfied their burden of establishing a prima facie case.[9]

■ Under the *McDonnell Douglas* model, defendant must rebut the presumption of discrimination raised by plaintiffs' pri-

ma facie case by articulating "some legitimate, nondiscriminatory reason" that would explain the differential treatment of the female guards. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *accord St. Mary's Honor Center v. Hicks*, 509 U.S. 502, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. To satisfy his burden, defendant must explain why plaintiffs were told they would have to cut their hair to comply with the policy while male guards were not, and why Wright specifically was allowed to tuck his hair into his coat. For example, defendant might show Wright was treated differently based on his tenure of service and accompanying seniority within the guard force. Dissimilar treatment might also be justified on the basis of his exemplary past work record. *See* Mack A. Player, *Employment Discrimination Law*, § 5.43. at 392 (1988). Likewise, it may be that Wright works a night shift outside of public hours, and strictest compliance with the policy is not necessary when the guards will not be in public view.[10]

■ However, instead of coming forward with a legitimate, nondiscriminatory explanation, defendant has effectively denied treating male guards any differently than plaintiffs. Defendant first asserts that plaintiffs were not similarly situated to male guards, because only plaintiffs failed to comply with the UDP after being counseled. However, as reviewed above, the issue is not whether defendant discriminated in enforcing the UDP once a particular guard was found to have violated its prohibitions, but rather, whether guards were held to different standards of compliance with the terms of the policy depending on their gender. Plaintiffs are claiming that had they been males, they would have not have been found in violation of the order in the first place. Their allegation is that defendant discriminates at a pre-

---

8. The Court refers to Willie Wright as "Wright" in the remainder of this Opinion. Wright is not to be confused with Ralph Wright, another of plaintiffs' affiants.

9. The Court recognizes that under applicable law, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094.

10. As *St. Mary's Honor Center* makes clear, defendant's burden is one of production. If defendant carries his burden, the presumption of unlawful discrimination drops from the case, and plaintiffs retain the ultimate burden of persuading the jury that they have been the victims of unlawful discrimination. *St. Mary's Honor Center*, 509 U.S. at —— ——, 113 S.Ct. at 2747–2748.

disciplinary stage, in that male guards were found in compliance with the UDP whereas females were held to a more exacting standard, and would be found in violation of the UDP. The fact that plaintiffs may have willfully disobeyed their supervisor's orders after being counseled for UDP violations is not relevant to that claim. Defendant admits Wright was allowed to tuck his ponytail into his coat, but argues this was irrelevant, because Wright's ponytail did not violate the terms of the UDP. In defendant's motion, he argues that because Wright's ponytail was tucked inside of and beneath his coat, it did not offend the UDP's prohibition of hair extending over the collar. Unfortunately, the best reading of the UDP suggests that "collar" refers to the shirt collar, not the jacket collar. The policy refers only to "the collar," (Guard Force Order No. 12, Uniform Dress Policy, October 1, 1992), refers to dress jackets as blouses, (Guard Force Order No. 12, § 4–1(d)), and lists different requirements for a guard's summer and winter uniform. One of the main differences is that in the summer, guards are not required to wear their jackets. (Guard Force Order No. 12, §§ 6–1(a–h), 6–2(a–i).) If "collar" referred only to the guard's jackets, then "collar" would be meaningless for a major portion of the year, as no special provision exempting guards from the hair requirement in the summer months is written into the policy. In addition, considering the way a jacket lies on the shoulders, the shirt collar would be in closest proximity to the hair line, and would not be covered by the jacket collar. Hair in a ponytail, even if tucked in the jacket, would visibly extend over the shirt collar. The Court cannot accept defendant's interpretation of the UDP on the facts presented.[11]

The Court recognizes plaintiffs' averments are somewhat vague and conclusory. The issues are not framed as squarely as the Court would prefer, and although plaintiffs have corrected some of the deficiencies in their complaint with affidavits lending specific factual support to their complaint's very general claims, defendant may have had difficulty isolating the precise nature of their disparate treatment claim. Nonetheless, defendant's denials do not operate as an articulation of a legitimate, nondiscriminatory reason for the dissimilar treatment of the plaintiffs and Wright.[12] As noted, under Title VII law, plaintiffs' burden in establishing a prima facie case is not onerous. Although their evidence showing disparate treatment is far from overwhelming, it is enough to establish a prima facie case. For defendant to prevail on a motion for summary judgment, he must offer some legitimate, nondiscriminatory reason for why Wright was treated differently from plaintiffs. Defendant has not done so, and without defendant's legitimate reason, a dispute as to material facts exists. Since there is dispute over material facts, and defendant has not yet adequately addressed plaintiffs' claim as required by the applicable law, summary judgment as to the issue of disparate treatment is denied.

### C. Retaliation

Plaintiffs advance two distinct retaliation claims. They first claim to have been subject to harassment, a hostile work environment, and disciplinary action in retaliation for filing a discrimination complaint.[13] Plain-

**11.** Sergeant Powell's indication that because Wright was on another shift, nothing could be done concerning his compliance with the UDP, further supports a reading that Wright's hairstyle violated UDP terms on their face, and also suggests defendant's OPS supervisors believed that to be true at the time.

**12.** Even defendant's evidence showing that certain males were counseled for violating the hair clause of the UDP does not satisfy their burden under the *McDonnell Douglas* model. That evidence shows that there is an issue as to a material fact, but does not supply a legitimate, nondiscriminatory reason for the allowance given Wright.

**13.** It is unclear from the materials before the Court whether plaintiffs intended to include a hostile work environment claim as a component of their retaliation claim, or whether they also intended the hostile work environment claim as a separate allegation. Title VII is violated, and conduct is actionable as hostile work environment harassment, when the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive as to alter the conditions of employment and to create an objectively hostile or abusive working environment. *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d

tiffs also claim they were denied administrative leave time to meet with an EEO counselor on May 26, 1993, also in retaliation for their complaint.

■ This Circuit requires plaintiffs to demonstrate the following three elements in making out a prima facie retaliation case: (1) that they engaged in an activity statutorily protected by Title VII; (2) that they were subject to adverse action by defendant, their employer; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989); *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984); *Klein v. Derwinski*, 869 F.Supp. 4, 8 (D.D.C. 1994); *Dhuria v. Trustees of Univ. of Dist. of Columbia*, 827 F.Supp. 818, 828 (D.D.C. 1993).

■ Plaintiffs' EEO complaint constitutes participation in the EEO process, which Title VII protects against reprisal. *See* 42 U.S.C.A. § 2000e–3(a). Many different employer actions can be viewed as retaliatory treatment; for example, retaliatory treatment may consist of harassment, disciplinary demotion, suspensions with pay, unjustified evaluations and reports, loss of normal work assignments, denial of letters of commendation, statements to prospective employers, or termination. *See* Barbara Lindemann Schlei and Paul Grossman, *Employment Discrimination Law*, Ch. 15, § V (2d ed. 1983).

### 1. *Plaintiffs' First Retaliation Claim*

■ Plaintiffs' first retaliation claim is comprised of three separate components. The first component alleges defendant sub-

jected them to harassment and a hostile work environment in retaliation for filing their administrative complaint, and is advanced by all six plaintiffs. The harassment and hostile work environment of which plaintiffs complain consisted of: (1) defendant insisting that plaintiffs comply with the UDP; (2) OPS supervisors inspecting them at roll call to determine whether they were fit for duty; and (3) supervisors shouting at them on occasion when they were in violation of the UDP. This same alleged "harassment" and "hostile work environment" existed prior to plaintiffs' engaging in the protected activity, as their own evidence shows. As early as January 1993, four months prior to plaintiffs' claim, defendant was insisting that plaintiffs comply with the order and was inspecting them for possible violations of the policy. An inference of causation is improper under these facts. Since plaintiffs have not shown any credible evidence of causation, defendant's motion for summary judgment is granted as to the first component of plaintiffs' claim.

■ In the second component of their first claim, all six plaintiffs allege that they were disciplined in retaliation for filing their complaint. This claim also suffers for failure of a showing of causation. Plaintiffs' own evidence shows that they were being placed on absence without leave and suspended as early as March, 1993, while their discrimination complaint was not filed until May 6, 1993. Again, no inference of causation is proper, and defendant's motion for summary judgment is granted as to the second component of their first claim.

■ The third component of plaintiffs' first claim is advanced by Batson, M. Harvey, and Mathis, alleging they were terminated in retaliation for filing a discrimination claim.[14]

---

49 (1986). To the extent that plaintiffs intended to allege hostile work environment as a separate claim, the Court cannot find that the few isolated incidents plaintiffs allege rise to a level of such severity and pervasiveness as to constitute a hostile work environment. Accordingly, defendant would be entitled to summary judgment on plaintiffs' hostile work environment complaint.

**14.** Plaintiff M. Harvey has not produced any evidence to support a finding of causation. She

has not given the date of her termination, nor has she produced other evidence showing that her firing was causally linked to her filing a complaint. No circumstances surrounding her termination are before the Court. M. Harvey has failed to show a prima facie case, and summary judgment is granted as to her claim. For the remainder of this section of the Opinion, the Court considers only Batson and Mathis's claim, and Batson and Mathis are referred to as "fired plaintiffs" in this section.

For purposes of this Opinion, the Court will assume, without deciding, that Batson and Mathis have established that their firings were causally linked to their participation in a protected activity because of the proximity in time.[15]

Since the fired plaintiffs have established a prima facie case, defendant bears the burden of articulating some legitimate, nondiscriminatory reason for his action. Defendant has produced evidence showing both Batson and Mathis engaged in objectionable non-protected activity. Defendant's uncontested evidence shows that on April 2, 1993, Batson wore a sign attached to her hair reading "I PROTEST" to roll call, while her hair was styled in violation of the order. She was ordered to report to the office of James Davis, OPS Deputy Chief, but instead left the building. On April 18, 1993, Batson reported to work in compliance with the UDP, but then let her hair down during duty. OPS supervisor Boomer requested Batson to comply; she first stated, "[n]o, send me home," and later said, "[n]o, I do not feel like it." (Def.'s Mot. for Summ.J.Ex.C.) Batson later requested leave from work on or about November 11, 1993. Her request was denied because she failed to provide proper medical documentation of the necessity for leave. Nonetheless, she did not show up for work from November 14, 1993, until January 8,

1994. That fact alone could justify defendant's adverse action.[16]

Defendant's uncontested evidence also shows that Mathis failed to report to work on January 16, 1994, February 5, 1994, and April 9 and 12, 1994. On March 29, 1994, she called a supervisor who was counseling her for violating the dress policy "stupid," and accused the same supervisor of abusing his authority, telling him to ·"use· [his] better judgment, not [his] title or position to bother people." (Def.'s Mot. for Summ.J.Ex.C.) On May 10, 1994, she told a counseling officer that "It [was not her] fault if you are not getting any at home," implying she was being counseled because her supervisor was sexually frustrated. (Def.'s Mot. for Summ.J.Ex.C.) Defendant has shown Mathis was absent from work without excuse, insubordinate to her superiors, and grossly disrespectful of authority, all legitimate grounds for termination.

Since defendant has provided legitimate, nondiscriminatory reasons for the fired plaintiffs' dismissal, the fired plaintiffs must come forward with evidence showing that defendant's reasons are merely pretextual, and that defendant's proffered reasons are not the true and actual reasons for their termination. *St. Mary's Honor Center,* 509 U.S. at ——, 113 S.Ct. at 2747. Batson and Mathis bear the ultimate burden of persua-

---

15. Batson was fired on May 13, 1994. Mathis was fired on June 25, 1994. Defendant's adverse action was taken at least one year after plaintiffs engaged in protected activity. While the Court will assume for purposes of this Opinion that the times are proximate enough to show causality, by no means is that outcome mandated. Causality can be inferred when an adverse employment action follows shortly after participation in protected activity. *Chen v. Gen. Accounting Office,* 821 F.2d 732, 739 (D.C.Cir.1987). However, the time lapse between a plaintiff's participation in the protected activity and an employer's adverse action, and what raises an inference of reprisal, depends on the particular situation. *See Garrett v. Lujan,* 799 F.Supp. 198, 202 (D.D.C.1992) (citing cases). *Compare Burrus v. United Tel. Co.,* 683 F.2d 339 (10th Cir.) (almost three years too long to infer retaliation), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Clark v. Chrysler Corp.,* 673 F.2d 921 (7th Cir.) (two years too long to support an inference), *cert. denied,* 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982); *Devera v. Adams,* 874 F.Supp. 17

(D.D.C.1995) (eight months does not strongly suggest a causal link); *Juarez v. Ameritech Mobile Communications, Inc.,* 746 F.Supp. 798 (N.D.Ill. 1990) (almost six months too long to support an inference), *aff'd,* 957 F.2d 317 (7th Cir.1992) *and Parrott v. Cheney,* 748 F.Supp. 312 (D.Md.1989) (less than four months too long to support an inference), *aff'd,* 914 F.2d 248 (4th Cir.1990) *with Womack v. Munson,* 619 F.2d 1292 (8th Cir.1980) (five days sufficient to infer retaliation), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981); *McCarthy v. Cortland County Community Action Program, Inc.,* 487 F.Supp. 333 (N.D.N.Y.1980) (two weeks sufficient to infer retaliation) *and Hochstadt v. Worcester Found, for Experimental Biology, Inc.,* 425 F.Supp. 318 (D.Mass.) (one month sufficient to support an inference), *aff'd,* 545 F.2d 222 (1st Cir.1976).

16. Batson also received the lowest performance appraisal ratings which could be considered successful in each of her approximately three years of service as a guard. (Def.Mot. for Summ. J.Ex.C.)

sion on the issue of whether they were the victims of intentional discrimination. *St. Mary's Honor Center,* 509 U.S. at ——, 113 S.Ct. at 2748; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). If the fired plaintiffs could show defendant's actions were more likely than not the product of intentional discrimination, the jury should find in their favor; but if they merely discredit defendant's proffered reasons, and show that they are unworthy of credence, the jury may infer that defendant's actions were discriminatory and find for the fired plaintiffs, although it is not required to make such a finding. *Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995); *Nayar v. Howard Univ.,* 881 F.Supp. 15, 21 (D.D.C. 1995) (citing *St. Mary's Honor Center,* 509 U.S. at ——, 113 S.Ct. at 2749).

■ Here, defendant's legitimate reasons for firing Batson and Mathis have gone unrebutted. The fired plaintiffs have not introduced evidence showing defendant's given reasons are pretextual, nor have they produced evidence to cast sufficient doubt as to the credibility of defendant's reasons. To avoid summary judgment, the fired plaintiffs are required to produce some objective evidence showing defendant's proffered reasons are mere pretext. This requirement demands no more than the Federal Rules of Civil Procedure, which require the non-moving party to demonstrate the existence of a dispute of material fact. *See Villanueva,* 930 F.2d at 129 (citing *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10). Even assuming Batson and Mathis had established a prima facie case of retaliatory firing, that presumption dropped from the case once de-

fendant offered legitimate, nondiscriminatory reasons for their firing. The fired plaintiffs were repeatedly told they would be subject to disciplinary action if they failed to follow their supervisor's orders. Not only did they disobey direct verbal and written orders, but they were also insubordinate, absent without excuse, and insolent to their supervisors. Defendant is entitled to expect cooperation from his employees, and the firing of these plaintiffs under the circumstances before the Court was reasonable. *Devera,* 874 F.Supp. at 21 (D.D.C.1995) (citing *Paul v. Fed. Nat'l Mortgage Ass'n,* 697 F.Supp. 547, 556 (D.D.C.1988)). No material issue of fact remains, and defendant's motion for summary judgment is granted as to the third component of plaintiffs' retaliation claim.

### 2. *Plaintiffs' Second Retaliation Claim*

Plaintiffs' original class complaint was filed with the NGA and their EEO officer, Cathy Yates, on May 6, 1993. On May 18, Yates informed plaintiffs that 29 C.F.R. § 1614.204(b) required them to first seek counseling and be counseled in accordance with 29 C.F.R. § 1614.105 before filing a class complaint.[17] On May 24, plaintiffs' counsel arranged an EEO counseling meeting for May 26. However, on May 26, plaintiffs' OPS supervisor, Captain James Thompson, denied them administrative leave time to attend their scheduled meeting. Plaintiffs' counsel contacted Yates about the denial of leave time. Yates took the position that defendant was not required to grant administrative time for EEO counseling, and instead defendant's policy was to require employees to take annual leave in order to participate in the counseling process.[18] The plaintiffs each

---

**17.** The relevant portion of § 1614.105(a) reads:
"Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a counselor prior to filing a complaint in order to try to informally resolve the matter."

**18.** The relevant sections of 29 C.F.R. § 1614.605, *Representation and Official Time,* are:

(a) At any stage in the processing of a complaint, including the counseling stage [§ 1614.105], the complainant shall have the right to be accompanied, represented, and ad-

vised by a representative of complainant's choice.

(b) If the complainant is an employee of the agency, he or she shall have a reasonable amount of official time, if otherwise on duty, to prepare the complaint and to respond to agency and EEOC requests for information.... The agency is not obligated to change work schedules, incur overtime wages, or pay travel expenses to facilitate the choice of a specific representative or to allow the complainant and representative to confer. The complainant and representative, if employed by the agency and otherwise in a pay status, shall be on official time, regardless of

filed annual leave requests that day. Except for Sumter's, all were denied. Bailey, M. Harvey, T. Harvey, and Mathis did not attend the counseling meeting on May 26, 1993; Sumter was the only plaintiff to attend that originally scheduled session. On June 10, 1993, the other plaintiffs attended an EEO counseling session, at which time they were told their counseling was complete.[19]

Viewed in the light most favorable to plaintiffs, their allegations have satisfied the requirements for making out a prima facie case of retaliation under the *McDonnell Douglas* model. Filing a class complaint with the EEOC was a protected activity under Title VII. Denial of leave to attend a counseling meeting can qualify as an adverse employment action. There is a close proximity in the sequence of events, which raises a presumption of causation. Thus, defendant must present a legitimate, nondiscriminatory explanation for his adverse action.

Defendant has given a legitimate, nondiscriminatory reason for Captain Thompson's denial of leave: plaintiffs' request for leave—to begin immediately—was submitted without advance notice at 9:50 A.M., on a day on which Bailey, M. Harvey, T. Harvey, and Mathis were scheduled to start work at 10:00 A.M. Thompson worried that releasing the four security guards assigned to duty that day without opportunity to secure replacement guards would jeopardize the security of the art works on display. Since protection of the Gallery's art is OPS's primary responsibility, plaintiffs' request could not be accommodated on such short notice. In addition, plaintiffs were able to attend a counseling meeting on June 10, 1993, during non-public hours, suggesting plaintiffs were not disadvantaged by the initial denial of leave.

Plaintiffs have not offered evidence showing defendant's proffered reasons are pretextual, nor have they demonstrated that they were disadvantaged by defendant's actions. Title VII can be "misused in a futile attempt to resolve what are essentially problems attributable to insensitive personnel management, not to discrimination." *Nance v. Librarian of Congress,* 661 F.Supp. 794, 798 (D.D.C.1987). Yates may have made an administrative error. The *Mitchell* case suggests that plaintiffs were entitled to administrative leave time to attend their counseling meeting. *But cf. Jones v. Babbitt,* 52 F.3d 279 (10th Cir.1995) (limiting the scope of complainant activities requiring administrative leave time). Still, administrative errors are not discrimination. A policy that complainants were not owed administrative time for counseling suggests a nondiscriminatory explanation for Yates's position. Furthermore, from the record before the Court, it appears that Yates had nothing to do with the decision to deny administrative leave. Although she was contacted by plaintiffs' counsel that day, the decision to deny leave appears to have been made solely by Captain Thompson. Plaintiffs' only injury seems to be that Sumter was forced to take annual leave to attend the counseling meeting, and the rest of the plaintiffs had to wait 16 days to attend a counseling session. Plaintiffs bear the burden of proving that they have been the victims of illegal retaliation, and they have failed to produce evidence showing defendant's proffered reasons for denying administrative leave are pretextual. No conflict as to the material facts in question remains, and since there is no issue of material fact in dispute, defendant's motion for summary judgment on plaintiffs' second retaliation is granted.

their tour of duty, when their presence is authorized or required by the agency or the Commission during the investigation, informal adjustment, or hearing on the complaint.

19. Plaintiffs' counsel filed a formal EEO complaint of discrimination, within the 15–day period, as required, on June 22, 1993. A formal complaint was sent to the EEOC to determine whether it should be processed as a class complaint. On June 22, 1994, the EEOC accepted plaintiffs' class complaint for discrimination, but dismissed the portion of the complaint alleging retaliation, as counseling was not properly sought within 45 days of the alleged retaliation pursuant to 29 C.F.R. § 1614.107(b). Defendant has not objected to plaintiffs' retaliation claim on the grounds that by failing to seek counseling, the claim was not properly pursued at the administrative level.

### CONCLUSION

For the reasons stated above, the Court denies plaintiffs' motion for class certification. In addition, the Court grants defendant's motion for summary judgment as to plaintiffs' disparate treatment and retaliation claims. Defendant's motion for summary judgment as to plaintiffs' disparate treatment claim is denied. Thus, this federal case barely survives, after already consuming extensive resources, based upon one man's ponytail.